THE UNITED STATES DISTRICT COURT,
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Ex. Rel. Janet Halpin and Shawn Fahey as | ) |
| co-relators | ) |
| | ) Civ. Action No. _____ |
| Plaintiffs | ) |
| | ) FILED UNDER SEAL |
| v. | ) PURSUANT TO 31 U.S.C |
| | ) SECTION 3730(b)(2) |
| Kindred Healthcare Inc.("Kindred/ | ) |
| RehabCare") | ) |
| | ) DO NOT PLACE IN PRESS |
| Defendant | ) BOX OR IN PACER |
| | ) |

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

Plaintiff, the United States of America, by Janet Halpin and Shawn Fahey, as co-relators, ("relator Halpin" and "relator Fahey") bring this action under the False Claims Act, as amended, 31 U.S.C. Sections 31 U.S.C. 3729 et seq. ("FCA").

1. This is an action by the relators Janet Halpin and Shawn Fahey on behalf of the United States of America to recover penalties and damages arising from a fraudulent billing scheme in which the defendant, Kindred/RehabCare willfully and deliberately overcharged or caused overcharges to be submitted the United States Government for rehabilitation services provided to Medicare A and Medicare B patients for a period of time at least from 2005 to June 2011. Additionally, the nation-wide systematic fraudulent scheme is ongoing. Defendant Kindred/RehabCare knowingly and purposefully billed Medicare for rehab services provided to patients, which services were excessive and unrelated to individual medical necessity but rather designed to maximize the defendant's recovery from Medicare and its corporate profits. Kindred/RehabCare

1

also manipulated the Medicare B "Eight Minute Rule" by having its therapists add time to their therapy sessions, not for patient medical needs but rather to capture more "reimbursement units" thereby defrauding the government by billing Medicare for that extra time. Kindred/RehabCare has set a company wide employee productivity quota which, by its very nature, resulted in excessive treatment schedules unrelated to patient needs. In addition, Kindred/RehabCare punished employees who did not comply with the strictly enforced productivity protocol resulting in the overbilling of Medicare even where patients cannot tolerate the overly rigorous schedules.

2.      This complaint is based upon non-public information regarding the Defendant's rehab services scheduling and billing practices, which are company wide at Kindred/RehabCare , designed to obtain the highest levels of Medicare reimbursement without consideration of medical necessity or need. The purposeful and knowing actions of the defendant violated, among other laws, 42 U.S.C. Section 1395y(a)(1)(A) which provides that *no Medicare payment may be made for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury..."*

3.      As required by 31 U.S.C. sec. 3730(b)(2), the relators have provided to the Attorney General of the United States and to the United States Attorney for the District of Massachusetts, s statement of all material evidence and information related to the complaint. That disclosure is supported by material evidence known to the relators resulting from their positions within Kindred/RehabCare.

## JURSIDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3732(a) and (b) and is brought under 31 U.S.C. section 3730.

2

5. Venue is proper in this district pursuant to 31 U.S.C. section 3732(a) because
The Defendant is located in this district and transacts business in this district and the
Defendant committed a number of acts proscribed by 31 U.S.C. Section 3729 in this
district.

## PARTIES

6. The relator Janet Halpin is a licensed physical therapist and resident of
Amesbury Massachusetts, employed as a Rehab Manager for the defendant
Kindred/RehabCare in Wingate At Haverhill, a skilled nursing residence located in
Haverhill, Massachusetts. She has worked for the company since 2008.

7. The relator Shawn Fahey is a licensed occupational therapist who was
employed by Kindred/RehabCare from June 23, 2010 to April 10, 2011 working at The
Edgewood Retirement Community ("Edgewood"), a skilled nursing residence located in
Haverhill, Massachusetts. She is a resident of New Hampshire.

8. RehabCare Group Inc. ("Kindred/RehabCare) provides
rehabilitation program management services in hospitals, skilled nursing facilities,
outpatient facilities and other long-term care facilities in the United States. It operates in
two segments, program management services and hospitals. In February 2011, Kindred
Healthcare Inc., a private health care company based in Louisville Kentucky, acquired
RehabCare. In a joint announcement, the companies said that the purchase created the
largest post-acute health care services company in the United States with operations in 46
states and more than $6 billion in annual revenues. The combined company has 118 long-
term acute care hospitals, with 8,492 beds and 226 nursing and rehabilitation centers. The
relator has direct information presented herein that the fraudulent practices engaged by

3

Kindred/RehabCare are company wide practices involving all of Kindred/RehabCare's regions and serviced facilities throughout the United States and  the company fraud described herein has been ongoing for several years and continues to be ongoing, costing the government millions of dollars which should not have been paid to the defendant.

## MEDICARE PAYMENT FOR SERVICES

9.  The Medicare and Medicaid Programs are large medical assistance programs involving billions of dollars in Government spending to health care providers each year. As alleged, the defendant submitted or caused to be submitted false or improper claims for treatment of Medicare beneficiaries under the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. Sections 1395, et seq. in violation of the False Claims Act.

10.  The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to the federal government. 31 U.S.C. Section 3729(a)(1).

11. As one of its functions, the United States Department of Health and Human Services (HHS), through the Healthcare Financing Administration (HCA), administers the Medicare Program.

12.  Medicare reimburses hospitals and other medical providers in two ways. First. Medicare Part A funds healthcare facilities that care for Medicare patients. Second, Medicare Part B pays providers for "identifiable personal" care for Medicare patients.

13. Physical, occupational and speech therapy for skilled nursing facility patients are covered services under the Medicare program but Medicare coverage guidelines state that the therapy "must be reasonable and necessary for the treatment of the patient's condition; this includes the requirement that the *amount, frequency, and duration* of the

4

services must be reasonable." CMS Skilled Nursing Facility Manual Section 214.3A1 Furthermore. The Social Security Act Provides that *no Medicare payment may be made for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury*…"42 U.S.C. Section 1395y (a)(1)(A). To lawfully bill Medicare for services. documentation regarding such services *must adequately establish reasonableness and medical necessity*. Congress has conditioned payment for many Medicare items and services on a certification signed by a physician attesting that the item or service is medically necessary.  The Defendant **Kindred/RehabCare's own Code of Conduct states that the False Claims Act applies to Medicare and Medicaid program reimbursements and prohibit, among other things "billing for unnecessary services."**

## FACTS COMMON TO ALL COUNTS

### Billing for Medically Unnecessary Services – Setting Schedules For Highest Levels of Reimbursement

14.     As part if her duties as the Rehabilitation Manager at Wingate Haverhill. the relator Halpin oversaw the schedules of the speech therapists. occupational therapists and physical therapists employed by Kindred/RehabCare. The Kindred/Rehabcare guidelines. utilization rates systems and quotas incorporate a "carrot and stick" approach to assure strict adherence to schedules set with total disregard to patient medical necessity.

15.     Kindred/RehabCare has a company wide mandate that 60-70% of the patients receiving therapies should be scheduled to reach the "Ultra High" level of Medicare reimbursement. the highest Resource Utilization Group("RUG") Medicare reimbursement level. This is tightly controlled via the scheduling of patient therapies

both in terms of the numbers of sessions per week as well as the minutes per session. To reach the 60-70% goal means that of ten patients 6-7 must meet the Rehab level of Ultra High or 720 minutes during the ARD "look back" period. These mandates are enforced rigorously by the Defendant Kindred/RehabCare via close real time computer monitoring of schedules by regional administrators and daily email and telephonic communications with Rehab Managers in each facility. For example in an email sent from the Defendant's Director of Operations to an operations area in January 2011 said "Remember KPI goals for the whole region Part A 1.1. RUG distrib RU 60-70%..."

16.     The Assessment Reference Date (ARD) is the date that signifies the end of the "look back" period used by Medicare to determine the patient's level of care for purposes of reimbursement. Medicare has established levels for reimbursement as follows: ***Ultra High 720 + Minutes 2 Disciplines; 1 Discipline at a minimum 5 Days; 144 min/day. Very High 500+ Minutes; Minimum 1 Discipline 5 Days 100 min/day; High 325+Minutes; Minimum 1 Discipline 5 Days; 65 min/day; Medium 150+ minutes 5 Days across 3 Disciplines; 30 min .day; Low 45+ minutes; 45 minutes total + 2 nursing rehab functions for at least 6 days; 45 min/week.*** Defendant

Kindred/RehabCare sets patient schedules for either Ultra High (UH); Very High (VH) or High (H) and Medicare is billed for these levels based on the number of treatments and the minutes per treatment even though they are not based on patient medical need.

17. The relator Halpin does this by taking the frequency set by the evaluating therapist and assuring that she inputs sufficient minutes in each treatment during the week to meet the RUGs  levels during and only during the ARD look back periods.

### Patient "evaluations" and Setting Number of Therapies For Profit Not Medical Need

18. The Defendant Kindred/RehabCare requires that patients be evaluated immediately for therapy treatments by one of the Kindred/RehabCare therapists. In addition, Kindred/RehabCare mandates Rehab Managers to immediately review each patient's therapy schedule and to determine the number of minutes for each treatment session.

19. When a patient arrives, emails are sent from the facilities to Kindred /RehabCare Rehab Managers, alerting them that a new patient will be arriving. On the day of arrival, the patient is required to be evaluated by a Kindred/RehabCare Therapist. 100% of all patients evaluated are expected to receive therapy. In addition, invariably, Kindred/RehabCare patients are automatically scheduled for five days a week of therapy and often with more than one type of therapy per day. This schedule for the number of days for therapy is set regardless of patient medical necessity. The therapists know that Med A patients require therapy five days per week in order for it to be "billable" .

20. During the period of time that the relator Fahey was been employed by the Defendant Kindred/RehabCare, she too observed that all of the patient schedules were set so that they would reach one of three highest Medicare RUGs reimbursement levels, Ultra, Very High or High. Relator Fahey observed it was automatic that each and every Medicare A patient would be scheduled for therapies five times per week. In addition, she observed that the number of minutes per session was set to assure that the schedule would result in reimbursement at the highest levels during the "look back period" for Medicare. That is the time when it is determined what Medicare reimbursement rates would be set. Often the scheduled minutes were very long, over 80

7

minutes per session and the relator Fahey was told that this was because the company had to make up minutes lost when a patient had refused therapy before.

**Ramping Down Schedules After The "Look Back Period" To Increase Profits**

21.    The Defendant Kindred/RehabCare , via its highly structured rules, procedures, quotas and productivity rates. In addition the Defendant uses a computerized monitoring program to help control the therapy schedules for highest profits. Just after the reimbursement rates are established in the look back period, the therapy schedules are then ramped down significantly to reduce the Defendant's labor burden thereby increasing profits. The reimbursement during this ramp down period remains at the higher levels set at the look back period. The result is that millions of dollars have been fraudulently bills and received from Medicare for many years and is ongoing.

22.    Relator Halpin observed Specific patient examples of the look back spiking and post look back period ramping down on the following patients:

a) Patient "C.C.": MedA. Look back period set 2/5/11 784 Ultra. 2/12 reductions begin to Very High (601,631,554,509,505 and 424) by 2/17 patient is at High.

b) Patient "M.B.": MedA. Look back period set 12/17/2010 721 Ultra. The next day dropped to 661 Very High; 12/21/2010 611; 12/23 557 and by 12/24 at 429 which is Medium.

c) Patient "M.B." MedA. Look back period set 4/13/2011 767 Ultra. 4/15/2011 700 Very High; 4/17/2011 677; 4/19/2011 434 High.

d) Patient "E.B." Med A. Look back period started 9/02/2011 802 Ultra. 9/09/2011 612 Very High; 9/13/2011 192 Low; 9/15/2011 Medium and by the next look back period day 9/19/2011, she is back to Ultra at 763.

e) Patient "M.B." MedA. Look back period started 4/13/2011 at 764

Ultra. By 4/18/2011 she is at 28 Low; 4/19/2011 169 low and by 4/27/2011 the next

lookback date she is back up to Ultra with 770.

f) Patient "V.B." MedA. Look back period starts 11/24/2010 at 773

Ultra. The next day 11/25/2010 he is down to 688 Very High and by 11/28/2011 down to

590 Medium and by 12/01/2010 229 Medium.

g) Patient "E.B." MedA. Look back 7/30/2011 349 High. 8/01/2011 346

Medium. 8/06/2011 185 Medium.

h) Patient "S.B." MedA. Look Back 4/27/2011 734 Ultra. 4/29/2011 634

very High. By 5/6/2011 438 Medium.

i) Patient "C.C." MedA. Look Back 11/29/2011 721 Ultra. 11/20/2011

626 Very High and by 12/08/2011 566 Medium.

j) Patient "D.C." MedA. Look Back 4/24/2011 770 Ultra; 4/26/2011 655

High and by 4/28/2011 354 Medium.

23.    Relator Halpin estimates that she has set schedules of hundreds of patients

at Kindred/Rehabcare since becoming Rehab Manager in 2008 in which the look back

reimbursement rate was set at Ultra and just after the look back period was dropped down

significantly to increase company profits.

24.    Defendant Kindred/RehabCare therapists know to schedule patients for

therapy 5-6 days per week regardless of medical necessity, because otherwise they will

not meet the company required productivity quotas.

25.    After the daily schedules of therapy are set, the relator Halpin then

scheduled the correct number of minutes per therapy session that will meet the

9

Defendant's requirements including having 60-70% of the team's patients in the RU
RUG level, the highest Medicare reimbursement level.. The scheduling is *unrelated* to
the patient medical needs.

26.     Kindred/RehabCare specifically defines the productivity of its therapists
as their total *billable* minutes divided by the total time the therapist is in the building. The
company also mandates that when a therapist drops below the required productivity of
85% (patient billable to Medicare), then they are not allowed to stay in the building, *they*
*must leave*. As a practical matter, this means that they are sent home and are not paid for
time not in the building.

27.     In order to maintain their health insurance benefits, the
Kindred/RehabCare's therapists must maintain minimum of 24 hours per week. Because
company rules do not allow therapists to stay around when they are not treating
patients.this means they must always have patients to treat to maintain their hours. As a
result of this "Catch-22," all patients are initially scheduled for five days a week of
therapy and often with more than one type of therapy per day, at the highest levels, in
order to protect the therapist's jobs by assuring a sufficient pool of patients with
scheduled therapies to fill therapist's time. These schedules are set regardless of patient
medical necessity. The therapists are paid on an hourly basis without holiday pay or over
time, which means that the only way therapists make extra money is through the bonus
system.

28.     During the period of time that the relator Fahey was employed
by the Defendant Kindred/RehabCare, she too observed that all of the patient schedules
were set so that they would reach one of three highest Medicare RUGs reimbursement

10

levels. Ultra. Very High or High. The relator Fahey also observed that it was automatic that each and every Medicare A patient would be scheduled for therapies five times per week. In addition, she also noted that the number of minutes per session to assure that the schedule would result in reimbursement at the highest levels at the period of time known as the "look back period" for Medicare. Often the scheduled minutes were very long, over 80 minutes per session and the relator Fahey was told that this was because the company had to make up minutes lost when a patient had refused therapy before.

## Trolling For Patients

29. Kindred/RehabCare's therapists who run low on patients to treat are at risk for loss of benefits and ultimately their job. As part of the Kindred/RehabCare protocols, the therapists are required to "troll" facilities for patients who had not previously been ordered medically to receive therapy services. The trolling this is not done for medical necessity of the patients but rather to boost and maintain company profits and provide an injection of new patient into the system. The Defendant calls the trolling process "Part B Identification." For example, in one email, the Defendant's Operations Manager stated "PD has done a stellar job of identifying patients to pick up…" Trolling involves therapists walking around the facilities and asking nurses if any patients are having trouble walking, eating or speaking. If a nurse responds affirmatively, the therapist does an immediate evaluation.

30. The relator Fahey observed that Kindred/RehabCare patients would generally arrive from the hospital with "OT/PT" work orders already in their medical records. The relator or other therapists would then evaluate the patients the same day or the next day in order to write "clarification orders". The patients were all scheduled for

11

five days per week of therapy sessions. The relator observed that there were patients who did not need five days and in fact some who should not have been there at all. As an example, many of the Med B would be scheduled for just 3 days per week.

31.     Unless a patient was unable to do the therapy due to a physical limitation, the Kindred/RehabCare therapists are required to pressure the patients to complete each therapy session that was assigned to them.

**Computer Programming Patient Schedules Based on Profit Not Medical Necessity**

32     Kindred/RehabCare uses a computer software program which is designed to automatically reconfigure patient treatment schedules to maximize company profits. For example, the computer program used by the Defendant was programmed to notice immediately when the planned minutes did not match directly with company utilization rates. More specifically, the computer program called "Planner3" automatically changed planned minutes if under-delivery occurred. For example, a therapist felt a session was over, stopping the therapy five minutes early, the computer will automatically added the five minutes on to the next day's session. This program is used on a company-wide basis and patient therapy schedule alterations by computer has been a daily occurrence for at least two years.

33.     The Kindred/RehabCare Planner3 will also automatically change planned minutes if "under delivery" occurs and the patient is in the look back period. For example, if PT planned 60 minutes and provided 50 the following day, 10 additional minutes will have been added to the PT planned minutes. This is done without regard to patient need. Indeed there are many reasons why a full 60 minutes including physical

tolerance. The computer should not be deciding how long the patient treatment should last, this is the task of the therapist in accordance with patient need.

### Company wide utilization rates for therapist productivity fueling the fraud

34.   The Defendant Kindred/RehabCare has established a "utilization rates" system which is a productivity measure strictly enforced nation wide. An employee consistently failing to meet the utilization rate can result in termination of employment. Utilization rates are used to determine how tightly the daily minutes are managed to attain the "capped" number of minutes of the anticipated RUG levels.

35   The company utilization rate is determined by taking the total number of "capped" Medicare minutes by levels (720 Ultra; 500+ Very High; 325+ High; 150+ or 45+) divided that by the minutes of therapy actually delivered to the patients. For example 720 minutes capped (Ultra) (the maximum that will be paid) divided by 795 actual minutes spent with the patients would equal a 91% utilization rate .All employees are required to keep track of the time in therapy and to know their UR. The company-wide UR budget goal is 1.1.

36.   As a practical matter only way a department or division could possibly meet the established company budget goal of 1.1 utilization rate is to restrict the number of minutes the patient receives therapy after the "look back" period, while still receiving the full reimbursement rate calculated during that period as the minutes were much higher. This means the company received full reimbursement at the highest levels but provided less labor as the sessions were reduced.

37.     The Defendant's utilization rates and quotas are a systemic part of the Medicare fraud as they result in treatment schedules unrelated to medical need and excessive.

**Bonus Structures Rewarding High Therapy Schedules Not Based on Medical Need**

38.     Kindred/RehabCare's bonus structure pays full time therapists a percentage of their salaries if they meet company utilization rates and productivity requirements.

39.     The bonus is solely dependant on the therapist's percentage of productivity as previously described herein. The Kindred/RehabCare incentive program is called The PatientPlus Incentive Plan. Bonuses under this plan are calculated as a percentage based on volume of qualifying patient care time (PCT) plus other billable time (OBT) divided by the total number of hours on site, less travel time, cross over time and student supervisory time. To qualify for the bonus, a therapist must fall within the following ranges:

| THERAPIST PRODUCTIVITY | BONUS |
|---|---|
| 87%-89% | 3% |
| 90%-92% | 4% |
| 93%-100% | 5% |

40. Relators Halpin and Fahey observed that as a practical matter, the incentive plan results in over-scheduling of treatments because the therapists needed to increase their treatment billable time in order to make the bonuses. This is especially the case because patients miss appointments for various reasons and this down time would work against the therapists obtaining any bonus. In context, not only are the companies

scheduling patients for therapy sessions based on exacting the most profits from

Medicare and not based on the patient's medical necessity, as required by law.

Kindred/RehabCare has also used the bonus program to incentivizes higher amounts of

therapy sessions resulting in greater profits, all unrelated to patient needs.

## Upcharging and Providing Medically Unnecessary Therapies Using the Med B 8 Minute Rule

41. Medicare Part B therapy services are billed to Medicare by selecting the

HCPCS code that most accurately identifies the service provided and applying the proper

number of units based on the code billed. It means that in order to bill for a 15 minute

code, Medicare requires that the session be at least eight minutes long. The guide for the

range of minutes that are needed for billing 15-minute codes are as follows:

| 15 minute codes | Treatment Units |
|---|---|
| 1 unit | 8 minutes to 22 minutes |
| 2 units | 23 minutes to 27 minutes |
| 3 units | 38 minutes to 52 minutes |
| 4 units | 53 minutes to 67 minutes |
| 5 units | 68 minutes to 82 minutes |
| 6 units | 83 minutes to 98 minutes   Exhibit 11 |

42. Medicare still reimburses only for treatment which is medically necessary.

Part of Kindred/RehabCare's scheme to maximize reimbursement based on artificial

structures is the manipulation of the 8 minute rule to gain profits on units billed against

time actually spent. The manner in which this is done is to require the therapists to watch

the clock during the therapy sessions and to make sure that they provide enough minutes

of therapy in order to capture additional units for billing. This is the case even if a therapist thinks a session should end. For example, in one email, The Defendant's Supervisor said " ...will educate therapists on the treating patient on Med B Rule. If they need to be at 55 minutes versus 52 minutes to get the unit..."

43.    Relator Halpin had several conversations with her supervisor and emails from various people about the Med B "8 minute rule" and company utilization rates. Relator Halpin was instructed that if a therapist was only two minutes away from 23 minutes which would have allowed the company to submit for payment of another unit from Medicare. This is company protocol which has been used for years and which is ongoing and which has resulted in fraudulent billing of large sums of moneys from Medicare.

44.    Relator Fahey and other therapists working with her were told by Defendant's Management that with Med B patients they should watch the clock closely and if her therapy sessions were going to end at the end of a segment comprising a unit, they should continue the sessions until they reached the next unit. For example if her session was going to end at 21 minutes, she should extend it to 23 or 24 minutes in order to pick up the extra units and reimbursement to the company.

**Favoring Med A Over Med B Patients and Maniplating the Med B "8 Minute Rule"**

45. During the late months of 2010, the relator Fahey and other therapists were told by their supervisor that Med A patients are to be seen before Med B patients such that if they had a lot of Med A patients, they were to take precedence over the Med B patients. In addition and more specifically, the Relator was told that Medicare A patients

16

are more important that Medicare B. patients and that the therapists were only to see the Med B patients for 15 minutes if they were too busy with Med A patients. In addition, Relator Fahey was told said that they were not to group Med B patients as this was no longer allowed. Relator Halpin was also told that The Defendant requires that Med A patients in assessment MUST be seen so not to lose a RUG levels, even if Med B patients are bumped as a result. RehabCare sent out written "strategies" to avoid missing RUG levels including "bumping" Med B patients over Med A patients.

### Discouraging Grouping of Patients

46.    In October 2011, Medicare changed its billing rules for patients who received treatments in a group setting. The providers were no longer able to bill the patient separately but rather had to bill by dividing the group by the number of patients. For example four patients would allow for billing only 25% for one patient. When that change occurred, the defendant sent out company wide notification that grouping patients was to be discouraged. This determination was not related in any way to patient needs. An August 19, 2011 email from a Supervisor employed by the Defendant said "…next, as you all know, the message was clear that group is no longer the "push" but a realilty that we should minimize or eliminate. I would like you all to make every attempt to implement this going forward in anticipation of Oct. 1."

### Forged Physician Signatures

47.    After the patients were evaluated for care by a therapist a t the facility where the relator Halpin works, the therapists' plan of care had to be signed, in writing by the patient's physician or the medical director. In addition, a Nurse Practitioner could sign the evaluations.

48.     On or about February 2011, the relator learned that the medical evaluations written by the therapists were not being signed by a physician or Nurse Practitioner, but rather the initials of the Medical Director were being signed by a Licensed Practical Nurse, who told the relator that the medical director of the facility had given her permission to sign his name.

49.     The certification on the therapy evaluation form reads: "I certify that I have reviewed this plan of treatment and that these services are medically necessary. Physician signature and date."

50.     On or about February or March 2011, the relator was speaking with a Nurse who said to the relator, "Don't tell anyone but he (Dr. "E") gave me permission to sign his name." As she said this, Nurse Brown handed the relator a folder which contained therapy evaluations which had an undated signature purporting to be that of Dr "E" asking her to fill them in. Linda told the relator "I am not going to do that, its illegal."

51.     The Defendant Kindred/RehabCare submitted or caused others to submit false claims to the government. Each claim submitted contained the following certification:

> Submission of this claim constituted certification that the billing Information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

52.     At all times relevant to the Complaint, Kindred/RehabCare knowingly Submitted or caused to be submitted false or fraudulent claims to Medicare that were (1) falsely inflated or "upcoded" and knowingly provided an inflated amount of therapy services not justified by the patient's medical condition but rather intended to secure for Kindred/RehabCare, a larger payment from Medicare.

## Fraudulently Extending Patient Stays Solely For Profit and Not Medical Need— Staggering Discharges

53. At all times relevant in the Complaint, the Defendant Kindred/RehabCare knowingly and purposefully extended patient stays and delayed patient discharge dates in order to increase profits and this resulted in unnecessary treatments for the patients and costs to Medicare billed, or caused to be billed by the defendant. The company preference was and still is, not to discharge patients on the same day, even where they no longer require therapy, but rather to stagger patient discharges so as to maximize and income from charges to Medicare.

54. As an example, one supervisor email stated "If you are not staggering discharges, you should be. All disciplines are not meeting goals on the same day. This will help your utilization." This is just one example of how patient treatment and even the completion date of patient treatments are not determined by the medical necessity of the patients but rather maximizing company profits.

### False Billings For Services Not Rendered

55. An Assistant Physical Therapist employed by Kindred/RehabCare in North Andover Massachusetts and known by his first name "David" by relator Fahey, repeatedly and over at least two years, billed time to Medicare patients he was not treating. Relator Fahey and another therapist repeatedly brought this to the attention of Relator Fahey's supervisor. The fraudulent billing continued and the employee was not punished or terminated.

56. On April 10, 2011, shortly after complaining to Ms. Murray about David, she was called in and told that she was being terminated from her employment at Kindred/RehabCare.

**Count I: FALSE CLAIMS ACT VIOLATION**

58.     The Relators restate and incorporated by reference all paragraphs
above as if fully set forth herein.

59.     Defendant Kindred/RehabCare knowingly presented or caused to be
presented, directly or indirectly, false and fraudulent claims for payment or approval to
the United States, including claims for payment for services rendered to patients that
were not medically necessary and for services falsely inflated during the period 2005 to
2011.

60.     The Defendant Knowingly presented or caused to be presented, directly or
indirectly, false and fraudulent claims for payment on services which were excessive
and/or therapy services which were not scheduled based on the medical needs of patients
but rather on company profits. The Defendant manipulated Medicare's system of
reimbursements to obtain compensation at high levels while in fact were providing
patient therapy at lower levels to reduce labor costs and increase profits. The Defendant
set its therapist to troll for new patients who had not been diagnosed as needing therapy
services and but the patient trolling would not have received therapies from the
defendant. The Defendant engaged in the use of a system wide computer system which
was programmed to alter the patient therapy schedules to increase company profits
instead of creating patient schedules for medical need, as the law requires. The Defendant
created productivity quotas and bonus incentives to increase patient therapy schedules.
The Defendant manipulated the Medicare B billing procedures and upcoded billing for
Med B patients under the 8 minute rule. The defendant knew of and allowed forging of
physician certifications of medical necessity and allowed for billing when services were

not rendered. All of this was knowing and willful and resulted in express false certifications and fraudulent billing to Medicare for at least six years from between 2005 to the present date and is ongoing at this writing. All of this violated various statutes and regulations including the Social Security Act.

61.     With the exception of the assertion of billing for services not rendered in paragraphs 55-56 above, the other wrongdoings described herein are not limited to the facilities where the relators in this case work, but rather are company-wide practices. The relator Halpin knows this through the emails she receives and weekly "Medicare meetings" which she attends in which company representatives from outside her facility attend via videoconference. She also knows that these practices are company wide because she is familiar with and uses daily, the company computer systems and knows that these systems are used company wide. By virtue of the false and fraudulent claims presented or caused to be presented by the defendant, the United States suffered damages.

**COUNT II: RETALIATION IN VIOLATION OF 31 U.S.C. SECTION 3730(h)**

62.     Relators re-allege all paragraphs above as if set forth herein.

63.     In April, 2011, shortly after the relator Shawn Fahey complained about a a co-employee who was not providing therapy services while still billing for his time, the defendant terminated the relator Fahey's employment. This termination was a violation of 31 U.S.C. Sec 3730(h).

64. As a direct and proximate result of this unlawful termination, the Plaintiff relator has suffered emotional pain and mental anguish together with serious economic hardship including lost wages and special damages.

WHEREFORE, the relators Halpin and Fahey request this Court to enter judgment against defendants as follows:

a. That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Complaint.

b. That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the U.S. or caused to be presented;

c. That pre and post judgment interest be awarded, along with reasonable attorneys fees costs and expenses;

d. That the relators be awarded the maximum amount allowed under law:

e. That for Count II the relator be granted all relief necessary to make her whole including but not limited to two times back pay and other damages;

f. That the Court award further relief as it deems proper.

## JURY TRIAL DEMAND

Relators on behalf of themselves and the United States demand jury trial on all claims alleged herein.

THE PLAINTIFFS DEMANDS JURY TRIAL ON ALL COUNTS

Respectfully submitted,

THE RELATORS Janet
Halpin and Shawn Fahey By
their Counsel,

Jeffrey A. Newman Esq.

Law Offices Jeffrey A.
Newman
BBO # 370450
One Story Terrace
Marblehead, Ma. 01945
617-823-3217