# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————————

UNITED STATES OF AMERICA *ex rel.*
JANET HALPIN and SHAWN FAHEY,

      Plaintiff,

      v.

KINDRED HEALTHCARE, INC.,
REHABCARE GROUP, INC., d/b/a
REHABCARE GROUP THERAPY
SERVICES, INC., and REHABCARE
GROUP EAST, INC.,

      Defendants.

—————————————————————————

No. 1:11cv12139-RGS

## UNITED STATES' AMENDED COMPLAINT IN INTERVENTION

This is an action against defendant rehabilitation therapy provider Kindred HealthCare, Inc., and its RehabCare subsidiaries (collectively, "RehabCare") to recover treble damages, restitution, and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and the common law for causing RehabCare's skilled nursing facility ("SNF") customers across the United States to submit false claims to Medicare for therapy services that were unreasonable, unnecessary, or unskilled, or that simply did not occur as RehabCare reported them to have occurred. The action further alleges that RehabCare gave one of its largest customers a kickback that caused false claims to Medicare.[1]

As detailed below, during the period from January 1, 2009, through September 30, 2013, RehabCare engaged in various schemes to create false records and to cause the submission of false claims for unreasonable, unnecessary, or unskilled therapy, or for therapy that did not occur

—————————————

[1] The publicly-available version of this Complaint contains redactions pursuant to LR 5.3.

as reported.  These schemes included:

- Presumptively placing patients in the highest therapy reimbursement level, rather than relying on individualized evaluations to determine the level of care most suitable for each patient's clinical needs;

- "Ramping," *i.e.*, during the period prior to October 1, 2011, boosting the amount of reported therapy during so-called "assessment reference periods," thereby causing and enabling SNFs to bill for the care of their Medicare patients at the highest therapy reimbursement level, while providing materially less therapy to those same patients outside the assessment reference periods, when the SNFs were not required to report to Medicare the amount of therapy RehabCare was providing to their patients;

- Scheduling and reporting the provision of therapy to patients even after the patients' treating therapists had recommended that they be discharged from therapy;

- Arbitrarily shifting the number of minutes of planned therapy between different therapy disciplines (*i.e.*, physical, occupational, and speech) to ensure targeted therapy reimbursement levels were achieved, regardless of the clinical need for the therapy;

- Providing significantly higher amounts of therapy at the end of a therapy measurement period not due to medical necessity but to reach the minimum time threshold for the highest therapy reimbursement level and thus to cause and enable SNFs to bill for the care of their Medicare patients accordingly, even though the patients were receiving materially less therapy on preceding days;

- Inflating initial reimbursement levels by reporting time spent on initial evaluations as therapy time in violation of the Medicare prohibition on counting initial evaluation time as therapy time;

- Reporting that skilled therapy had been provided to patients when in fact the patients were asleep or otherwise unable to undergo or benefit from skilled therapy, *e.g.*, when a patient had been transitioned to palliative end-of-life care; and

- Reporting estimated or rounded minutes instead of reporting the actual minutes of therapy provided.

RehabCare engaged in some or all of these schemes at SNFs throughout the United States.  In addition, RehabCare caused the submission of false claims by some SNFs operated by Life Care Services LLC ("LCS"), based in Des Moines, Iowa, by giving an LCS affiliate a kickback in the

2

form of the free services of a RehabCare employee stationed at the office of the LCS affiliate.

**Jurisdiction and Venue**

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1345.  The Court has

supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C.

§ 1367(a).

2.      The Court may exercise personal jurisdiction over the defendants, and venue is

appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because

RehabCare transacts business in this District and caused the submission of false claims in this

District.

**The Parties**

3.      Plaintiff United States, acting through the Department of Health and Human

Services ("HHS"), administers the Medicare Program, Title XVIII of the Social Security Act, 42

U.S.C. §§ 1395-1395kkk ("Medicare").

4.      Relator Janet Halpin is a resident of Massachusetts.

5.      Relator Shawn Fahey is a resident of New Hampshire.

6.      Defendant Kindred Healthcare, Inc., is a healthcare services company that,

through its subsidiaries, operates various businesses.  On June 1, 2011, it merged with

RehabCare Group, Inc., d/b/a RehabCare Group Therapy Services, Inc., and RehabCare Group

East, Inc., which together now operate as a division of Kindred Healthcare, Inc.  According to

the 2013 annual report for Kindred Healthcare, Inc., "[a]s of December 31, 2013, [the RehabCare

division of Kindred] provided rehabilitative services to 1,806 nursing centers in 45 states."

Furthermore, according to that annual report, RehabCare is the "largest contract therapy

company in the United States based upon fiscal 2013 revenues of approximately $1.0 billion."

**The False Claims Act**

7.      The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent
claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim; [or]

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement
material to an obligation to pay or transmit money or property to the Government, or
knowingly conceals or knowingly and improperly avoids or decreases an obligation to
pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less
than $5,000 and not more than $10,000, . . . plus 3 times the amount of
damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a) (2006), as amended by 31 U.S.C. § 3729(a)(1) (West 2010).[2]  For purposes

of the False Claims Act,

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information – (1) has actual
knowledge of the information; (2) acts in deliberate ignorance of the truth
or falsity of the information; or (3) acts in reckless disregard of the truth or
falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b) (West 2010).

---

[2]  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the
Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47,099,
47,103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for
violations occurring on or after September 29, 1999.

### The Anti-Kickback Statute

8. The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering or paying any remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services. "[A] claim that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

9. The Office of the Inspector General of HHS ("OIG") has specifically warned that, "[w]hile the mere placement of an . . . employee in [a customer's] office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the [employee] performs additional tasks that are normally the responsibility of the [customer's] office staff." OIG Special Fraud Alert, 59 Fed. Reg. 65,372, 65,377 (Dec. 19, 1994); *see also* OIG Advisory Opinion 98-16 (Nov. 3, 1998) (cautioning that, where a health care vendor assigns an employee to work in a customer's office and the employee provides services that the customer otherwise would have to provide at its own expense, "an inference arises that one purpose of [such an] arrangement is to induce or reward referrals"), *available at* http://oig.hhs.gov/fraud/docs/advisoryopinions/1998/ao98_16.htm.

### The Medicare Program

**A. Basic Medicare Coverage Requirements**

10. Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

11.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

12.     Subject to certain conditions, Medicare Part A covers up to 100 days of care in a SNF for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

13.     Among the conditions that Medicare imposes on its Part A SNF benefit are that: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay).  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

14.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the SNF and re-certify the patient's continuing need for skilled rehabilitation therapy services at regular intervals thereafter.  *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

15.     To be considered "skilled," a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists.  *See* 42 C.F.R. § 409.31(a).

16.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking).  *See* 42 C.F.R. § 409.33(d).  "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature.  Those services can be performed by supportive personnel; e.g. aides or nursing personnel . . . ."  Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

17.     Medicare Part A covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury."  *See* 42 U.S.C. § 1395y(a)(1)(A).  In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

18.     In order to make it possible to assess whether services are reasonable and necessary, and therefore eligible for reimbursement, Medicare rules require proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a).

19.     In order to submit claims to Medicare, each SNF must submit a Medicare Enrollment Application in which the SNF certifies, among other things, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . .  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*See* CMS Form 855A.

**B.     Medicare Reimbursement for SNF Care**

20.     Under its prospective payment system ("PPS"), Medicare pays a SNF a daily rate for each day of skilled nursing and rehabilitation services provided to a patient.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).  The rate is based, in part, on the patient's anticipated "need for skilled nursing care and therapy."  *Final Rule for Medicare Program's Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities*, 64 Fed. Reg. 41,644 (July 30, 1999).  Specifically, the daily PPS rate that Medicare pays a SNF depends on the Resource Utilization Group ("RUG") to which a patient is assigned, and each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.  There are five general rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy:  Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

21.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment reference period (also known as the "look back period").  The chart below reflects the requirements for the five general rehabilitation RUG levels and the corresponding daily reimbursement ranges during federal fiscal year 2011:

| Rehabilitation RUG Level | Requirements to Attain RUG Level | Daily Reimbursement Range[3] |
|---|---|---|
| Ultra High (RU) | at least 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week | $512.75 – $869.42 |
| Very High (RV) | Between 500 and 719 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $466.28 – $786.66 |
| High (RH) | Between 325 and 499 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $375.71 – $722.91 |
| Medium (RM) | Between 150 and 324 minutes per week total therapy; therapy must be provided at least 5 days per week but can be any mix of disciplines | $324.26 – $668.30 |
| Low (RL) | minimum 45 minutes per week total therapy; therapy must be provided at least 3 days per week but can be any mix of disciplines | $263.76 – $431.05 |

74 Fed. Reg. 40,288, 40,332 (Aug. 11, 2009); 75 Fed. Reg. 42,886, 42,894 (July 22, 2010).

22.     The Ultra High RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."  63 Fed. Reg. 26,252, 26,258 (May 12, 1998).  In announcing the final PPS rule for SNFs, the Centers for Medicare and Medicaid Services ("CMS") further explained that the RUG system "uses minimum levels of minutes per week as qualifiers . . . .  These minutes are minimums and are not to be used as upper limits for service provision. . . .  Any policy of holding therapy to the bare minimum, regardless of beneficiary need, is inconsistent with the statutory requirements . . . and will result in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care."  64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

---

[3]  These rates were for SNFs in urban areas.  The specific reimbursement amount within each range depended on additional factors, including the patient's ability to perform certain activities of daily living such as eating and toileting, and the patient's need for extensive services such as intravenous treatment, or ventilator or tracheostomy care.

23.    A nursing facility must determine each patient's RUG as of specific "assessment reference dates" ("ARDs"), and the RUG as of the ARD then determines the daily reimbursement rate prospectively for a specific timeframe.   As of 2011, the Medicare assessment schedule was as follows:

| RUG Assessment Type | Assessment Reference Date Window (including grace days) | Medicare Payment Days Determined by RUG |
| --- | --- | --- |
| 5 day | Days 1-8 | Days 1-14 |
| 14 day | Days 11-19 | Days 15-30 |
| 30 day | Days 21-34 | Days 31-60 |
| 60 day | Days 50-64 | Days 61-90 |
| 90 day | Days 80-94 | Days 91-100 |

76 Fed. Reg. 26,364, 26,389 (May 6, 2011).

24.    SNFs report therapy treatment times for each assessment reference period on a Minimum Data Set ("MDS") form that is completed as of each ARD in a patient's stay.  *See* 64 Fed. Reg. at 41,661; 42 C.F.R. § 413.343.  Prior to October 1, 2010, a SNF would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008).  Since October 1, 2010, SNFs transmit the data directly to CMS.  42 C.F.R. § 483.20(f)(3).  Completion of the MDS is a prerequisite to payment under Medicare.  *See* 63 Fed. Reg. at 26,265.  The MDS form requires a certification by the provider stating, in part:  "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.  I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."  MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care

10

Screening.  A patient's RUG information is also incorporated into the Health Insurance

Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment

amount owed to the nursing facility.  The HIPPS code must be included on the CMS-1450 form,

which SNFs submit monthly to Medicare via intermediaries known as Medicare Administrative

Contractors that process and pay Medicare claims.  Medicare Claims Processing Manual, Ch. 25,

§ 75.5.

25.     Prior to the commencement of therapy in any discipline, a therapist certified in

that discipline must evaluate the patient and develop a treatment plan that is approved by a

physician.  *See* 64 Fed. Reg. at 41,660-61; 42 C.F.R. §§ 409.17, 409.23.  The therapy time-

reporting rules make clear that "[t]he time it takes to perform the formal initial evaluation and

develop the treatment goals and the plan of treatment may not be counted as minutes of therapy

received by the beneficiary."  64 Fed. Reg. at 41,661; *see also* RAI Manual, Ch. 3 at O-19 (Oct.

2014) ("The therapist's time spent on documentation or on initial evaluation is not included.").

HHS has explained that "[t]his policy was established because we do not wish to provide an

incentive for facilities to perform initial evaluations for therapy services for patients who have no

need of those specialized services."  64 Fed. Reg. at 41,661.  The purpose, however, is not to

deprive providers of compensation for performing initial evaluations, because "the cost of the

initial assessment is included in the payment rates for all Medicare beneficiaries in covered Part

A SNF stays."  *Id.* at 41661-62.

26.     Concurrent therapy is the treatment of two residents at the same time who are not

performing the same or similar activities.  *See* 74 Fed. Reg. at 40,315.  Until October 1, 2010, if

a therapist provided 60 minutes of concurrent therapy to two beneficiaries at the same time, a

SNF could attribute 60 minutes to each patient when determining each patient's RUG level.

Effective October 1, 2010, CMS began requiring SNFs to divide the amount of time spent administering concurrent therapy between the two beneficiaries serviced; thus, if 60 minutes of concurrent therapy were provided, the SNF could attribute only 30 minutes to each beneficiary. *Id.* at 40,318-19.

27.     In group therapy, a single therapist conducts the same or similar therapy exercises with two to four beneficiaries at the same time.  *See* 76 Fed. Reg. 48,486, 48,516 (Aug. 8, 2011) (clarifying that, after October 1, 2011, group therapy must be planned for four patients).  Group therapy should be initiated only after determining that the patient can benefit from therapy provided in a group setting and that the group therapy provided is necessary and appropriate for the patient.  76 Fed. Reg. at 48,514.  "Therapists should document how the prescribed type and amount of group therapy will meet the patient's needs and assist the patient in reaching the documented goals."  *Id*.

28.     Until October 1, 2011, the therapy time-reporting rules contemplated that, if a therapist were to provide treatment to a group of up to four beneficiaries, "then it is appropriate to report the full time as therapy for each patient . . . [so long as] no more than 25 percent of the minutes reported in the MDS [for each therapy discipline] may be provided in a group setting." 64 Fed. Reg. 41,644, 41,662.  Thus, for example, if a physical therapist conducted a 60 minute treatment session with four patients, the relevant MDS form for each of those patients could reflect the 60 minute treatment session.  If, however, the MDS form for a particular patient reported a total of 200 minutes of physical therapy during the assessment reference period, then the SNF could not count more than 50 minutes (*i.e.*, 25 percent of 200) of group therapy toward that total.  To the extent the patient had received more than 50 minutes of group therapy during the assessment reference period, those additional minutes could not be reflected on the MDS

form.  Effective October 1, 2011, the group therapy time-reporting rules changed:  under the new

rules, group therapy must be intended for four patients, and the relevant MDS form for each of

those patients should reflect one-fourth of the total time spent by the therapist in the group

session.  *See* 76 Fed. Reg. at 48,513-14.

29.     Effective October 1, 2011, the Medicare rules further imposed a requirement that

SNFs report a so-called Change of Therapy ("COT") if, after an assessment for a particular

patient, "the intensity of therapy (that is, the total reimbursable therapy minutes . . .) changes to

such a degree that it . . . no longer reflect[s] the RUG[] classification and payment assigned" for

that patient. 76 Fed. Reg. at 48,518.  Specifically, at the end of each 7-day period after an

assessment, if the therapy delivered during that period does not match the last reported RUG,

then the SNF must report the actual level of therapy being delivered in a COT, and the

reimbursement for that patient's care will be adjusted accordingly.  *See id.* at 48,518-26.  For

practical purposes, this change turned every week into a new look back period.

<u>**RehabCare's Relationships with SNFs**</u>

30.     SNFs contract with RehabCare to provide rehabilitation therapy services to their

patients and SNFs submit claims to Medicare based, in part, on the amount of therapy that

RehabCare claims to have provided.

31.     For Medicare Part A patients, the SNFs' contracts with RehabCare typically

provide that the SNF will pay RehabCare a specified amount per day per patient, with the

amount depending on the RUG level of the patient.  For example, RehabCare's October 2011

contract with one SNF provided that the SNF would pay RehabCare $▮▮▮ per day for each

Medicare Part A patient in the Ultra High RUG category, $▮▮▮ per day for each patient in the

Very High RUG category, $▮▮▮ per day for each patient in the High RUG category, etc.  A

copy of that contract is attached as Exhibit 1.

32.     In marketing its services to SNFs, RehabCare typically prepares a pro forma that

compares the facility's current Medicare Part A revenue and percentage of Medicare Part A days

at the Ultra High RUG level with Medicare Part A revenue and the percentage of Medicare Part

A days at the Ultra High RUG level that RehabCare predicts it can realize for the SNF.

**RehabCare Practices That Caused False Claims For Unreasonable, Unnecessary, Or
Unskilled Therapy Services, Or For Therapy That Was Not Provided As Reported**

General Therapy Scheduling Practice

33.     At each RehabCare-served SNF, RehabCare typically employed an on-site

manager known as a Program Director, physical therapists, physical therapist assistants,

occupational therapists, occupational therapy assistants, speech-language pathologists, and

rehabilitation technicians.  State laws required that the therapists and therapist assistants be

certified.  The rehabilitation technicians typically were not state-certified clinicians.  The

Program Directors often were state-certified therapists or therapy assistants, but sometimes were

uncertified technicians.  Program Directors reported to Area Directors of Operations, who

oversaw the rehabilitation programs in a number of skilled nursing facilities in a geographic

region and reported to Regional Directors of Operations or Regional Vice Presidents.

34.     Although RehabCare licensed therapists conducted the initial evaluations of each

new SNF patient, the plans of care prepared by the therapists did not specify the number of

minutes of therapy a patient should receive.  Instead, the RehabCare Program Directors and/or

the technicians set the daily therapy schedules for the therapy personnel and the SNF patients

receiving therapy.  Typically, the Program Directors and/or the technicians determined a planned

ARD and RUG for each patient and then plotted the schedules out into the future so that the

planned RUG would be achieved by the next planned ARD.  Although each assessment

reference period has a window of potential ARDs and the actual ARD need not be selected until

the end of the window, RehabCare directed its Program Directors to plan for a specific ARD in

advance.  By way of example, attached as Exhibit 2 is a July 25, 2012, e-mail from a RehabCare

Area Director, Carla DiGregorio-Wolfe, who was then serving as an acting Program Director at

the Wingate at Haverhill SNF.  In the e-mail, Ms. DiGregorio-Wolfe advised that she had "set

[patient] ███████ ['] 14 d[ay] ARD for 8/10" and that she "had to move" the 14-day ARD of

another patient, "████." Thus, although the SNF ultimately would report to Medicare the ARD

and the minutes of therapy provided as of that date, RehabCare generally determined those data

points.

      35.      The Program Directors and technicians used computer software to assist in

plotting the schedules.  Beginning in 2010, RehabCare used a scheduling software program

called "Smart."  RehabCare distributed to each of its Program Directors a manual on how to

manage therapy resources and use Smart.  A copy of that manual is attached as Exhibit 3.

   Focus on Increasing Percentage of Rehabilitation Patients Billed at the Ultra High RUG Level

      36.      RehabCare used several numerical metrics, called "Key Performance Indicators"

or "KPIs," to evaluate each of its Program Directors.  One of those metrics was "RU%," the

percentage of therapy days billed at the Ultra High RUG level in any given period.  In some

instances, RehabCare gave its Program Directors specific RU% targets.  For example, for

Christopher Grant, the RehabCare Program Director at the Ferncliff SNF in Rhinebeck, New

York, RehabCare set an RU% target of 70% in 2012.  A copy of the document reflecting this

target is attached as Exhibit 4.

37.     In order to increase the RU%, RehabCare encouraged its Program Directors to plan an Ultra High RUG for each new SNF patient, regardless of clinical need for care at that level of intensity.  An example of a patient who received treatment immediately at the Ultra High RUG, without any clinical justification, is ▮▮▮▮▮, a patient at the Heritage Oaks SNF in Arlington, Texas.  ▮▮▮▮▮ was a 92-year-old female, long-term resident of the SNF with dementia and severe cognitive deficiencies.  She was hospitalized in June of 2011 for a urinary tract infection and dehydration.  Upon discharge from the hospital, she was readmitted to the SNF and the SNF then billed Medicare Part A for her care at the Ultra High RUG level through August 15, 2011.  Both before and after hospitalization, ▮▮▮▮▮ required maximal assistance with bed mobility and transfers.  Although there was no indication that the urinary tract infection, dehydration, or hospital stay had decreased her level of functioning, RehabCare provided her with physical therapy for nearly a month before discharging her with no improvement.  Similarly, she was provided occupational and speech therapy even though the therapists noted that she was already at her prior level of functioning when they initially evaluated her.  The SNF's claim for the treatment of ▮▮▮▮▮ at the Ultra High level was false because care at that level of intensity was not reasonable and necessary.  Data reflecting that claim is included in Exhibit 5.

38.     At the Ferncliff SNF, if a Medicare Part A patient was admitted for physical and occupational therapy, the RehabCare Program Director, Mr. Grant, almost always would plan for the patient to receive 72 minutes of each of these two therapy disciplines on each weekday, so that the total weekly therapy time was exactly 720 minutes, the minimum amount necessary to report an Ultra High RUG.  There was no clinical basis for this practice, and, indeed, Mr. Grant consistently scheduled lower amounts of daily therapy for patients who were covered by

16

insurance less generous than Medicare Part A.

39.     Likewise, at the Terence Cardinal Cooke SNF in New York, if a Medicare Part A patient was admitted for physical and occupational therapy, the Program Director, Karen Wiedner, almost always would plan for the patient to receive 72 minutes of each of these two therapy disciplines on each weekday, so that the total weekly therapy time was exactly 720 minutes.  Even before patients were evaluated to determine their therapy needs and tolerances, Ms. Wiedner directed therapists to report having provided 72 minutes of therapy per day per discipline.  Thus, in one memorandum distributed to therapists at Terence Cardinal Cooke, the physical therapy supervisor working under Ms. Wiedner wrote:  "If the pt will be on PT 5xwk, you must do 72 min Tx day of eval."[4]  A copy of this memorandum is attached as Exhibit 6.  For example, prior to the initial physical therapy evaluations of patients ███████████ first day of physical therapy on June 22, 2013) ████████████ (first day of physical therapy on April 25, 2013), ██████████ (first day of physical therapy on May 9, 2013), and ██████████ first day of physical therapy on April 19, 2013), Ms. Wiedner directed that physical therapists treat each of these patients for 72 minutes on their respective first days of therapy.  Because there were no determinations of clinical justification for the amount of physical therapy purportedly provided on those dates, and because counting those minutes led Terence Cardinal Cooke to bill for unreasonable and unnecessary care at a higher RUG level than it otherwise would have, the associated claims for these treatments were false.  Data reflecting the claims for each of the aforementioned patients is included in Exhibit 5.  Moreover, as at the Ferncliff SNF, Ms. Weidner consistently directed therapists to provide lower amounts of daily therapy for

---

[4] *I.e.*, "If the patient will be on physical therapy 5 times per week, you must do 72 minutes of therapy on the day of evaluation."

patients who were covered by insurance less generous than Medicare Part A.

40.     As some Program Directors acknowledged, presumptively planning an Ultra High RUG for a patient not only was untethered to clinical need, but also had the potential to be harmful for patients who could not tolerate that level of therapy.  For example, in an e-mail dated November 28, 2012, a RehabCare Program Director at the Wingate SNF in Needham, Massachusetts, advised her manager that "we are continuing to rug all new residents into RU level upon admission" and then added that for some patients this was "really not clinically appropriate (we have had a lot of residents that are so medically compromised/hospice type level and have been difficult to get to the higher levels)."  A copy of this e-mail is attached as Exhibit 7.

41.     RehabCare's constant direction to achieve ever higher Ultra High RUG percentages at times further led its managers to encourage therapists to claim that they were providing skilled therapy when in fact they were providing only palliative care (*e.g.*, rubbing the back of a sleeping patient, or holding the hand of a patient near death), writing progress notes, or doing nothing patient-related at all.

42.     In some instances, RehabCare purportedly provided rehabilitation therapy that was inherently unnecessary because the patients were near death.  For instance, patient ██████ ██████ was an 85-year-old woman with coronary artery disease who was admitted to the Horizons Living & Rehab Center in Brunswick, Maine, on August 18, 2011.  Despite significant recent cardiac and pulmonary decline, and despite the patient's own expressed belief that she would not be able to return home, the RehabCare Program Director scheduled ██████ for enough therapy to bill at the Ultra High RUG level.  As one RehabCare therapist from the Horizons SNF later noted, "I don't think that clinical was ever even an issue for determining

high minutes or low minutes. . . .  [C]linical reasoning was not the determinant for minutes on

any day [at Horizons]."  After ▓▓▓▓▓▓ was put on therapy at an Ultra High level, nurses at

Horizons noted that ▓▓▓▓▓▓ had significant shortness of breath at times and was fatigued

after therapy.  On September 15, 2011, a day during which she supposedly received more than

three hours of therapy (and which was also the last day of an assessment reference period),

▓▓▓▓▓▓ declined to eat dinner and, according to the nursing notes, said "this was it" and

elected end-of-life "comfort care."  Morphine was ordered to make ▓▓▓▓▓▓

comfortable.  Even though ▓▓▓▓▓▓ was dying, RehabCare purportedly continued to provide

therapy to her for each of the next five days, including 39 minutes of occupational therapy on

September 20, 2011, the day she died.  The rehabilitation therapy that RehabCare purportedly

provided to ▓▓▓▓▓▓ after she was put on end-of-life palliative care was unreasonable and

unnecessary, and Horizon's resulting claim for ▓▓▓▓▓▓'s care during that period was false.

Data reflecting that claim is included in Exhibit 5.

43.     Similarly, at the Ferncliff SNF in Rhinebeck, New York, the RehabCare Program

Director repeatedly directed the continuation of therapy for patients who were near death and

could not tolerate or benefit from skilled therapy.  One Ferncliff therapy assistant testified that,

when he resisted providing therapy to a female Medicare Part A patient who was dying, the

Program Director told him to "make her feel comfortable and stuff."  Thus, when the therapy

assistant received directives to provide 72 minutes of therapy per day to patients who were

dying, he would "sometimes . . . sit up there and you know, hold their hand or something like

that."

<u>Focus on Utilization</u>

44.     Another RehabCare Key Performance Indicator was the "Utilization Factor" for

treatment of Medicare Part A patients at each Program Director's facility.  The RehabCare

Program Director manual defined the Utilization Factor as "[c]apped minutes by RUG level

divided by Treatment minutes."  *See* Exhibit 3 at KHC_RHB0181714.  The manual explained

that the "capped minutes by RUG level" was the minimum minutes threshold for each RUG, *i.e.*,

720 minutes for Ultra High, 500 minutes for Very High, etc.  When asked why the manual used

the term "capped," notwithstanding CMS's caution that the RUG minutes thresholds "are not to

be used as upper limits for service provision" (64 Fed. Reg. at 41,662), RehabCare's Director of

Compliance, Lorrie Mercer, testified that "capped" was "not a term that I would use" and that

"capped can imply some negative things."  *See* Exhibit 8 at 125-126.

45.     In order to incentivize Program Directors to save labor costs, RehabCare's

Program Director manual dated December 2010 specified that the company's "Target" for the

Medicare Part A Utilization Factor was "1.0."  Such a Utilization Factor would be achieved if,

for example, therapists delivered exactly 720 minutes of individual therapy to a patient who was

classified in the Ultra High RUG at the end of an assessment reference period.

46.     A utilization target of 1.0 meant that RehabCare was encouraging its Program

Directors to schedule each patient to receive exactly the minimum number of minutes necessary

to achieve the RUG planned for that patient during each assessment reference period, thereby

openly flouting CMS's warning that "[a]ny policy of holding therapy to the bare minimum,

regardless of beneficiary need, is inconsistent with the statutory requirements . . . and will result

in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care."  64

Fed. Reg. at 41,662.  When asked how RehabCare's utilization metric affected the scheduling of

therapy, a former RehabCare Area Director (one level above a Program Director), testified that:

> We needed to stay – [our] Med A utilization target was always 1.0 or higher.  1.0,
> meaning that you provided exactly 720 or 500 minutes.  So that was your target.

If you fell below that, that means you over-provided and that was frowned
upon. . . .

Another RehabCare Area Director conveyed the same corporate direction in an e-mail dated

March 3, 2010, to a Program Director:  "Please also sure [*sic*] up your [Medicare Part A]

utilization as anything less than 1.0 means you are over-providing minutes on the [Medicare Part

A] patients."  A copy of this e-mail is attached as Exhibit 9.  Similarly, during a call with her

Program Directors on June 18, 2012, RehabCare Area Director Carla DiGregorio-Wolfe warned

one Program Director that his "utilization is trending down the last three months . . . so it looks

like you're delivering too many minutes which is gonna kill you in the long run."  In 2012, a

RehabCare Regional Vice President went so far as to propose that RehabCare Program Directors

participate in a version of the movie "Hunger Games" where "all tributes will be eliminated if

their [Medicare Part A] utilization is not at 1.0 or greater."  A copy of the e-mail containing this

proposal is attached as Exhibit 10.

47.     RehabCare's Director of Clinical Operations, Glenda Mack, conceded in later

testimony that she "d[id not] believe it [a 1.0 utilization factor] should be a target" because,

among other things, "you're not taking anything about the patient into consideration."  *See*

Exhibit 11 at 197-98.  Despite her view that the 1.0 utilization target was improper, Ms. Mack

could not say whether, as of the date of her testimony in May 2014, RehabCare continued to list

that target in written materials provided to its Program Directors.  *See id.* at 199.  Ms. Mack

further testified that it was only after RehabCare received a subpoena from the Department of

Justice that she made a request to change the term "capped minutes" to the term "threshold

minutes."  *See id.* at 201.

48.     Especially prior to October 1, 2011, when COTs were introduced and changes

were made to the way group therapy minutes were counted, RehabCare managers sometimes

targeted utilization factors even higher than 1.0.  For example, in an e-mail dated January 19,

2011, RehabCare Area Director Stacy Shull told her Program Directors:  "Remember KPI goals

for the whole region:  part A util[ization] rate [is] 1.1. . . ."  A copy of this e-mail is attached as

Exhibit 12.  In order to achieve a utilization rate of 1.1 for a particular patient at the Ultra High

level (with a 720 minute minimum threshold at each ARD), RehabCare would have to deliver,

on average, only 655 minutes per week of individual therapy during his or her stay.  Thus,

RehabCare's utilization targets of 1.0 and higher not only encouraged providing the minimum

number of minutes necessary to achieve the planned RUG during each assessment reference

period, they also encouraged RehabCare Program Directors to schedule less intensive therapy for

patients who were not in assessment reference periods.  This is the practice of "ramping" (also

known as "rollercoastering," "moguling," or "suspension bridging"), whereby RehabCare would

provide a patient with enough therapy to achieve the planned RUG during an assessment

reference period, provide less intensive therapy to that patient in the following days, and then,

without any clinical justification, provide more intensive therapy to that patient during the next

assessment reference period.  For example, if a patient had a 35-day stay with ARDs on days 7,

14, 28, and the patient received 720 minutes of therapy during the seven days leading up to each

ARD but only 500 minutes of therapy per week outside out those assessment reference periods,

then the RehabCare Medicare Part A utilization factor for that patient would be 1.14

($\frac{720+720+720+720+720}{720+720+720+500+500} = 1.14$), above the target of 1.1 that RehabCare set in 2011.  Prior to

October 1, 2011, Program Directors also could increase their facilities' utilization rates by

providing group therapy, including by providing group therapy more than 25 percent of the time

when a patient was outside assessment periods.

     49.     RehabCare distributed rankings of its Area Directors based on the utilization

factors that their Program Directors achieved.  An example of such a ranking is attached as

Exhibit 13.  As the example shows, many Program Directors were able to achieve utilization

factors of greater than 1.0.

50.     When RehabCare Program Directors did not achieve a Medicare Part A utilization

factor of at least 1.0, their managers followed up with them.  For example, on April 18, 2010,

RehabCare Area Director Brian Sloane sent one of his Program Directors, Amir Tariq, a "KPI

[Key Performance Indicator] Tracker," which set his Medicare Part A utilization target at

between "1.00[] to 1.20[]."  A copy of this e-mail is attached as Exhibit 14.  After noting that Mr.

Tariq's Medicare Part A utilization factor so far that month was .96, below the minimum target

of 1.0, Mr. Sloane admonished Mr. Tariq, explaining that "You are over-providing minutes on

your [Medicare Part A patients]." *Id.*  Mr. Tariq apparently took this admonition to heart; the

following month, he managed to increase the Medicare Part A utilization factor at his facility,

Brighton Gardens of Bellaire, to 1.14.  In a June 13, 2010, e-mail regarding "financials,"

RehabCare's Regional Vice President, Jean Maes, congratulated Mr. Tariq, but implored him to

"try hard to keep this at or > 1.00."  A copy of this e-mail is attached as Exhibit 15.  In a prior e-

mail, Ms. Maes had made clear to Mr. Tariq why it was so critical to RehabCare's "financials"

that the Medicare Part A utilization factor stay above 1.0:  "It's an important KPI because we

don't get paid for mins over the cap but we have to pay the labor."  A copy of this e-mail is

attached as Exhibit 16.  By February 2011, RehabCare had increased the Medicare Utilization

goal at Brighton Gardens and other Texas facilities to 1.16.  A copy of the document reflecting

this revised goal is attached as Exhibit 17.

51.     RehabCare's Smart scheduling system also promoted ramping by prioritizing the

planning of minutes during assessment reference periods.  RehabCare instructed its Program

Directors to use Smart to identify Medicare Part A patients in planned assessment reference

periods (those patients' names appeared in pink text in Smart) and then to schedule therapy for

those patients before scheduling therapy for any other patients.  *See* Exhibit 18 at KHC_RHB-

0182504-06.  As both RehabCare's Director of Compliance, Ms. Mercer, and Vice President of

Clinical Operations, Ms. Mack, acknowledged in testimony, there was no clinical reason to plan

therapy first for patients who happened to be in assessment periods.  When asked whether there

was any clinical justification for this practice, Ms. Mercer testified that "I can't think of any,"

while Ms. Mack testified that, "From a clinical perspective I can't off the top of my head give

you a very specific reason."  *See* Exhibit 8 at 217; Exhibit 11 at 255-56.  As RehabCare well

knew, the practical effect of planning therapy first for patients who were in assessment periods

was that those patients received more therapy than either Medicare Part A patients who were not

in planned assessment periods or patients who were covered by other insurance such as Medicaid

or private insurance.

   52.  RehabCare also instructed its Program Directors to use the Smart system's "Auto

Planner" function to update therapy schedules daily.  This function would determine whether any

Medicare Part A patient in an assessment reference period had not received all of the therapy

minutes scheduled for that day and then add those minutes to the following day so as to ensure

that the planned RUG level still would be achieved.  As the RehabCare Program Director manual

explained, "If **treatment minutes were missed for the day**, the Auto Planner will **add the**

**missed minutes to the next day**.  This **only** applies to Med A residents in an Assessment

Reference Period (resident name is in Hot Pink)."  *See* Exhibit 3 at KHC_RHB-0181691

(emphasis in original); *see also id.* at KHC_RHB-0181677 (RehabCare Program Director To Do

List instructing Program Directors to "[c]heck for missed minutes carried over from the previous

day for Med A Residents in assessment periods (Hot Pink names) and adjust accordingly"). As

with RehabCare's practice of prioritizing the scheduling of therapy for Medicare Part A patients

in assessment reference periods, the practice of making up missed minutes only for those patients

meant that they generally received more therapy than other patients and that the amount of

therapy provided on days which included rollover minutes was not determined by clinical need.

53.     Both RehabCare's Director of Compliance, Ms. Mercer, and its Vice President of

Clinical Operations, Ms. Mack, acknowledged in testimony that there was no clinical

justification for RehabCare's practice of making up missed minutes only for Medicare Part A

patients who happened to be in assessment reference periods. When asked whether there was

such a justification, Ms. Mercer testified that "I can't think of one off the top of my head," and

Ms. Mack testified that there was "[n]othing that's immediately popping into my head." *See*

Exhibit 8 at 119; Exhibit 11 at 229. A former RehabCare Area Director was even more blunt,

agreeing in testimony that using the Auto Planner to make up missed minutes only for Medicare

Part A patients in assessment reference periods was "wrong and improper."

54.     Consistent with the focus on utilization, RehabCare senior managers also often

orally instructed Program Directors to reduce the amount of scheduled therapy for Medicare Part

A patients who were not in planned assessment reference periods. As one former RehabCare

Program Director testified, "we were taught that outside of the assessment period, to taper their

minutes a little bit . . . [because t]hey needed to utilize these periods in order to maintain benefits

and pay staff." Another former RehabCare Program Director testified similarly: "Again, I look

at the staffing. And if I have patients that are in assessment periods, we were taught to prioritize

the patients in the assessment periods."

55.     One RehabCare physical therapy assistant who worked at the Blaire House of

Milford (Massachusetts) SNF testified that, during a patient's assessment reference period "[t]heir minutes would be higher.  And then, when the [assessment reference] period was gone, they dropped."  She further explained how this played out with individual patients.  For instance, ████████████ a 92-year-old man who suffered from congestive heart failure, reportedly received an average of 81 minutes of physical therapy per weekday during his 14-day assessment period.  When his 14-day assessment period ended, however, the weekday average amount of physical therapy he received dropped to 49 minutes, a decrease of 40 percent.  (Meanwhile, the percentage of his physical therapy delivered in a group setting increased to as high as 42 percent, well over the 25 percent limit for therapy that could have been reported on an MDS form during an assessment reference period.)  The lower average daily total lasted until ██████████ approached the 30-day assessment period, during which his average weekday therapy again increased until the assessment period ended.  According to the sworn testimony of the RehabCare therapy assistant, there was nothing in ████████'s medical chart that would have justified either the increase in therapy provided to ████████during the assessment reference period or the drop immediately thereafter.

56.     The RehabCare therapy assistant also testified that the ramped-up therapy provided to ████████during his 30-day assessment period was more than what was necessary to satisfy his therapy needs and, at times, was "beyond what [████████ could tolerate."  For example, on September 6, 2010, a date that fell within ████████s 30-day assessment period, the supervising physical therapist reported that ████████'s cognitive and cardio respiratory functions appeared to be declining and he was showing "marked edema" – or visible swelling – in his lower extremities.  The very next day, ████████purportedly received 98 minutes of physical therapy – almost twice as many minutes as he was provided during any day of his stay

that fell in a non-assessment period.  The RehabCare therapy assistant acknowledged that, for ███████, this amount of therapy was "excessive."

57.     ███████ received occupational therapy in a similar pattern.  During his 14-day assessment period, he received an average of 72 minutes of occupational therapy per weekday.  Then, in the week between his 14-day assessment period and his 30-day assessment period – when the SNF did not have to report his therapy levels to Medicare – the average length of ███████'s weekday occupational therapy sessions fell to 27 minutes, only to increase to an average length of 81 minutes per weekday as soon as ███████ entered the 30-day assessment period.

58.     Because the amount of therapy provided to ███████ during his 14-day and 30-day assessment periods was not reasonable and necessary, the claims for the care provided during the reimbursement periods covered by those assessments were false.  Data reflecting those claims is included in Exhibit 5.

59.     As a consequence of RehabCare's focus on its utilization metric and its directives to Program Directors to prioritize therapy for Medicare Part A patients who were in assessment reference periods, the Program Directors in fact directed their therapists to provide more therapy to those patients without any clinical justification.  RehabCare often maintained records of the minutes of therapy it planned for patients.  Those records show that RehabCare commonly planned that Medicare Part A patients receive significantly more therapy when they happened to be in assessment reference periods.  Likewise, RehabCare's data on minutes of therapy purportedly delivered shows that, at RehabCare-served SNFs, RehabCare therapists commonly delivered significantly more therapy to Medicare Part A patients on days when those patients happened to be in assessment reference periods.  By way of illustration, below are bar charts

showing the average differentials between the amounts of therapy Medicare Part A patients

received on days inside and outside assessment reference periods at two RehabCare-served

facilities:  Ross Manor in Bangor, Maine, and Courtyards in Fort Worth, Texas.





60.     On an individual patient basis, prior to October 1, 2011, RehabCare's focus on its utilization metric and its directives to Program Directors to prioritize therapy for Medicare Part A patients who were in assessment reference periods meant that RehabCare commonly provided unnecessarily high amounts of therapy to Medicare Part A patients who were in assessment periods.  Examples of this common "rollercoaster" pattern of therapy at RehabCare-served SNFs include the following:

a.     ▇▇▇▇▇▇▇▇▇ Edgewood (North Andover, MA)

Below is a graph showing the rolling seven-day total therapy amounts (calculated as if each day were an ARD, *i.e.*, adjusting group minutes accordingly) that patient ▇▇▇▇▇▇▇▇ ostensibly received from RehabCare during his 2011 stay at the Edgewood SNF in North Andover, Massachusetts.



A table showing the daily minutes of therapy RehabCare reported providing to ▮▮▮▮▮ is attached as Exhibit 23.  As the graph indicates, RehabCare reported to Edgewood that it was providing therapy to ▮▮▮▮▮ at an Ultra High level at each ARD of his 100-day stay. Through claims submitted by Edgewood, RehabCare caused Medicare to pay for ▮▮▮▮▮ s care accordingly.  But RehabCare actually was providing ▮▮▮▮▮ with therapy at the Ultra High level during only 15% of the days in his stay.  When ▮▮▮▮▮ was not in an assessment reference period, RehabCare provided him with therapy at a much lower level of intensity. ▮▮▮▮▮ s clinical condition did not reflect the peaks and valleys that the graph reflects. Indeed, ▮▮▮▮▮, then 79 years-old, was a recent amputee with a prosthetic leg, but his medical records show that, during his 90-day assessment reference period, he had a blister on his stump that limited his ability to tolerate therapy.  Nonetheless, during that assessment period, RehabCare provided him with 721 minutes of ostensibly billable therapy (one minute over the Ultra High RUG threshold), compared to 576 minutes the week before and 394 minutes the following week, when ▮▮▮▮▮ was not in an assessment reference period and his minutes

were not reported on an MDS form.  There was no clinical justification for providing ▮▮▮▮▮ with more therapy inside assessment reference periods than outside those periods, and claims for his treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

              b.      ▮▮▮▮▮ Park Vista (Fullerton, CA)

Below is a graph showing the rolling seven-day total therapy amounts that patient ▮▮▮▮▮ ▮▮▮▮ ostensibly received from RehabCare during her 2010 stay at the Park Vista SNF in Fullerton, California.



A table showing the daily minutes of therapy RehabCare reported providing to ▮▮▮▮▮ is attached as Exhibit 24.  As the graph indicates, RehabCare reported that it was providing therapy to ▮▮▮▮ at an Ultra High level as of the 5-day, 14-day, 30-day, and 60-day ARDs.  Through claims submitted by Park Vista, RehabCare caused Medicare to pay for ▮▮▮▮▮'s care accordingly.  But RehabCare actually was providing ▮▮▮▮▮ with therapy at the Ultra High level during only 14% of the days in her stay.  When ▮▮▮▮▮ was not in an assessment reference period, RehabCare provided her with therapy at a much lower level of intensity.

██████'s clinical condition did not reflect the peaks and valleys that the graph reflects.  There

was no clinical justification for providing ██████ with more therapy inside assessment

reference periods than outside those periods, and claims for her treatment at the Ultra High level

were false.  Data reflecting those claims is included in Exhibit 5.

      c.        ██████████, Brighton Gardens (Bellaire, TX)

Below is a graph showing the rolling seven-day total therapy amounts that patient

███████████, then 92 years-old and recovering from hip surgery, ostensibly received from

RehabCare during her 2011 stay at the Brighton Gardens SNF in Bellaire, Texas.



A table showing the daily minutes of therapy RehabCare reported providing to ███████████ is

attached as Exhibit 25.  As the graph indicates, RehabCare reported that it was providing therapy

to ██████████ at an Ultra High level at each ARD of her 78-day stay.  Through claims

submitted by the SNF, RehabCare caused Medicare to pay for ██████████ care accordingly.

But RehabCare actually was providing ██████████ with therapy at the Ultra High level during

only 14% of the days in her stay.  When ██████████ was not in an assessment reference period,

RehabCare provided her with therapy at a much lower level of intensity.  Some of these variations were attributable to RehabCare's decision to provide ███████ with high proportions of group therapy, sometimes as high as 71 percent of all therapy delivered in the prior seven days, only outside assessment reference periods and without any explanation of why group therapy as opposed to individual therapy was necessary.  ███████ also received six days of physical therapy during her first assessment period even though her physician-approved treatment plan called for only five days per week of physical therapy.  ███████ clinical condition did not reflect the peaks and valleys that the graph reflects, and there was no clinical justification for providing ██████ with more intensive therapy inside assessment reference periods than outside those periods.  Indeed, the intensity of ███████ therapy was planned by a RehabCare Program Director, Amir Tariq, who was not even a licensed therapist or therapy assistant and thus was not qualified to assess her need for therapy.  There was no clinical justification for providing ██████ with more intensive therapy inside assessment reference periods than outside those periods, and claims for her treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

        d.      ██████████  Villa Valencia (Laguna Hills, CA)

Below is a graph showing the rolling seven-day total therapy amounts that patient ██████████ ostensibly received from RehabCare during his 2011 stay at the Villa Valencia SNF in Laguna Hills, California.



A table showing the daily minutes of therapy RehabCare reported providing to ████ is attached as Exhibit 26.  As the graph indicates, RehabCare reported that it was providing therapy to ████ at an Ultra High level on each ARD of his 40-day stay.  Through claims submitted by the SNF, RehabCare caused Medicare to pay for ████ care accordingly.  But RehabCare actually was providing ████ with therapy at the Ultra High level during only 15% of the days in his stay.  When ████ was not in an assessment reference period, RehabCare provided him with therapy at a much lower level of intensity.  ████s clinical condition did not reflect the peaks and valleys that the graph reflects.  There was no clinical justification for providing ████ with more therapy inside assessment reference periods than outside those periods, and claims for his treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

      e.         ████ Ross Manor (Bangor, ME)

    Below is a graph showing the rolling seven-day total therapy amounts that patient ████ ostensibly received from RehabCare during her 2011 stay at the Ross Manor SNF in Bangor, Maine.



A table showing the daily minutes of therapy RehabCare reported providing to ▆▆▆▆ is

attached as Exhibit 27.  As the graph indicates, RehabCare reported that it was providing therapy

to ▆▆▆▆ at an Ultra High level at each ARD of her 63-day stay.  Through claims submitted

by the SNF, RehabCare caused Medicare to pay for ▆▆▆▆'s care accordingly.  But

RehabCare actually was providing ▆▆▆▆ with therapy at the Ultra High level during only

12% of the days in her stay.  When ▆▆▆▆ was not in an assessment reference period,

RehabCare provided her with therapy at a much lower level of intensity.  Some of these

variations were attributable to RehabCare's decision to provide ▆▆▆▆ with high proportions

of group therapy, sometimes as high as 51 percent of all therapy delivered in the prior seven

days, only outside assessment reference periods.  In addition, during assessment periods,

RehabCare provided ▆▆▆▆ with more days of therapy than were ordered by her physician.

For instance, during ▆▆▆▆'s 5-day assessment period, after her physician had given orders

for her to receive physical and occupational therapy five days per week, RehabCare claimed to

provide her with each of those therapy disciplines on each day of the week.  Likewise, during

███████'s 30-day assessment period, when the five day per week order remained in place, RehabCare provided six days each of physical and occupational therapy.  Only with the additional days of therapy during those assessment periods was RehabCare able to achieve enough minutes to bill for ████████'s care at the Ultra High level. ████████'s clinical condition did not reflect the peaks and valleys that the graph reflects.  There was no clinical justification for providing ████████ with more intensive therapy inside assessment reference periods than outside those periods, and claims for her treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

     f.     ███████████████ Kateri (New York, NY)

Below is a graph showing the rolling seven-day total therapy amounts that patient ███████████████ ostensibly received from RehabCare during her 2011 stay at the Kateri SNF in New York, New York.



A table showing the daily minutes of therapy RehabCare reported providing to ███████████████ is attached as Exhibit 28.  As the graph indicates, RehabCare reported that it was providing therapy

to ▮▮▮▮▮▮ at an Ultra High level on each ARD of her 89-day stay.  Through claims

submitted by the SNF, RehabCare caused Medicare to pay for ▮▮▮▮▮▮▮'s care accordingly.

But RehabCare actually was providing ▮▮▮▮▮▮▮with therapy at the Ultra High level

during only 14% of the days in her stay.  When ▮▮▮▮▮▮was not in an assessment

reference period, RehabCare provided her with therapy at a much lower level of intensity.

RehabCare accomplished this ramping primarily by providing therapy to ▮▮▮▮▮▮▮six days

a week when she was within an assessment period, even though ▮▮▮▮▮▮▮'s physician had

ordered only five days a week of therapy.  Outside assessment periods, RehabCare provided ▮▮

▮▮▮▮▮ with only 4 or 5 days a week of therapy.  ▮▮▮▮▮▮▮s clinical condition did not

reflect the peaks and valleys that the graph reflects.  There was no clinical justification for

providing ▮▮▮▮▮▮with more intensive therapy inside assessment reference periods than

outside those periods, and claims for her treatment at the Ultra High level were false.  Data

reflecting those claims is included in Exhibit 5.

      g. ▮▮▮▮▮▮▮▮▮▮William Hill Manor (Easton, MD)

    Below is a graph showing the rolling seven-day total therapy amounts that patient

▮▮▮▮▮▮▮ostensibly received from RehabCare during her 2011 stay at the William Hill

Manor SNF in Easton, Maryland.



A table showing the daily minutes of therapy RehabCare reported providing to ▮▮▮▮▮▮ is attached as Exhibit 29.  As the graph indicates, RehabCare reported that it was providing therapy to ▮▮▮▮▮▮ at an Ultra High level on each ARD of her 35-day stay.  Through claims submitted by William Hill Manor, RehabCare caused Medicare to pay for ▮▮▮▮▮▮ care accordingly.  But RehabCare actually was providing ▮▮▮▮▮▮ with therapy at the Ultra High level during only 24% of the days in that stay.  When ▮▮▮▮▮▮ was not in an assessment reference period, RehabCare provided her with therapy at a much lower level of intensity.  Some of these variations were attributable to RehabCare's decision to provide ▮▮▮▮▮▮ with high proportions of group therapy, sometimes as high as 47 percent of all occupational therapy delivered in the prior seven days, only outside assessment reference periods and without any explanation of why group therapy as opposed to individual therapy was necessary.  The peak in therapy during the 30-day assessment reference period also was attributable in part to RehabCare's decision to provide ▮▮▮▮▮▮ with six days of both occupational and physical therapy during that week, even though it provided her with fewer days of therapy per week

outside assessment reference periods and even though her physician-approved treatment plan called for only five days per week of therapy. ████████ clinical condition did not reflect the peaks and valleys that the graph reflects.  There was no clinical justification for providing ████████ with more intensive therapy inside assessment reference periods than outside those periods, and claims for her treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

h. ████████ Park Manor (Cypress Station, TX)

Below is a graph showing the rolling seven-day total therapy amounts that patient ████████ ostensibly received from RehabCare during her 2010-11 stay at the Park Manor SNF in Cypress Station, Texas.



A table showing the daily minutes of therapy RehabCare reported providing to ████████ is attached as Exhibit 21.  As the graph indicates, RehabCare reported that it was providing therapy to ████████ at an Ultra High level as of the 5-day, 14-day, 30-day, and 60-day ARDs.  Through claims submitted by Park Manor, RehabCare caused Medicare to pay for ████████'s care

accordingly.  But RehabCare actually was providing ███████ with therapy at a much lower level when she was not in those assessment reference periods.  Some of the variations in the intensity of the therapy RehabCare reported providing to ███████ were attributable to RehabCare's decision to provide her with high proportions of group therapy, sometimes as high as 91 percent of all therapy delivered in the prior seven days, only outside assessment reference periods.  Despite physician orders for therapy five times a week, RehabCare also provided ███████ with more days during some assessment periods.  ███████s clinical condition did not reflect the peaks and valleys that the graph reflects.  There was no clinical justification for providing ███████ with more intensive therapy inside assessment reference periods than outside those periods, and claims for her treatment at the Ultra High RUG level were false.  Data reflecting those claims is included in Exhibit 5.

    i.  ███████ Citizens Care (Frederick, MD)

  Below is a graph showing the rolling seven-day total therapy amounts that patient ███████ ostensibly received from RehabCare during her 2010 stay at the Citizens Care SNF in Frederick, Maryland.



A table showing the daily minutes of therapy RehabCare reported providing to ▮▮▮▮ is attached as Exhibit 74.  As the graph indicates, RehabCare reported that it was providing therapy to ▮▮▮▮, an 84-year-old woman admitted with a femur fracture and a urinary tract infection, at an Ultra High level as of the 14-day, 30-day, and 60-day ARDs.  Through the claims submitted by Citizens Care, RehabCare caused Medicare to pay for ▮▮▮▮s care accordingly. But RehabCare actually was providing ▮▮▮▮ with therapy at the Ultra High level during only 32% of the days in her stay.  When ▮▮▮▮ was not in an assessment reference period, RehabCare provided her with therapy at a much lower level of intensity.  Some of these variations were attributable to RehabCare's decision to provide ▮▮▮▮ with high proportions of group therapy, sometimes as high as 81 percent of all therapy delivered in the prior seven days, only outside assessment reference periods.  ▮▮▮▮'s clinical condition did not reflect the peaks and valleys that the graph reflects.  There was no clinical justification for providing ▮▮▮▮ with more intensive therapy inside assessment reference periods than outside those periods, and claims for her treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

   j.  ▮▮▮▮ Blaire House of Milford (Milford, MA)

  Below is a graph showing the rolling seven-day total therapy amounts that patient ▮▮▮▮ ostensibly received from RehabCare during his 2010-2011 stay at the Blaire House of Milford SNF in Milford, Massachusetts.



A detailed table showing the daily minutes of therapy ███████ purportedly received is attached as Exhibit 60.  During the week prior to ████████'s 30-day assessment period, he received a weekday average of 38 minutes of occupational therapy.  During the 30-day assessment period, that average nearly doubled, to 74 minutes.  The following week, which was not in an assessment period, the average dropped back to 46 minutes.  ████████'s clinical condition did not reflect the peaks and valleys that the graph reflects.  There was no clinical justification for providing ████████ with more intensive therapy inside assessment reference periods than outside those periods, and claims for his treatment at the Ultra High level were false.  Data reflecting those claims is included in Exhibit 5.

61.     RehabCare knew that its practice of ramping reflected the provision of unreasonable or unnecessary therapy and that it was thereby causing SNFs to submit false claims to Medicare.  Prior to the merger with Kindred, RehabCare's Director of Compliance, Lorrie Mercer, prepared materials making clear that ramping was a "Fraudulent Practice[]."  An excerpt from those materials is attached as Exhibit 30.  In those materials, Ms. Mercer warned as

follows:

> Medicare expects that:
> - Residents should receive services based on medical necessity.  Manipulating therapy minutes based on financial gain rather than the resident's needs is considered fraud.
> - Patient care practices during non-assessment periods should be consistent with patient care practices during assessment periods.

She further explained that:

> Ramping is the practice of significantly:
> 1. Increasing minutes during an assessment period to achieve a higher RUG category and greater reimbursement
>    OR
> 2. Decreasing minutes during a non-assessment period once a RUG category has been achieved and reimbursement determined

She also specifically addressed the practice of providing more group therapy during non-assessment periods:

> **Medicare Part A Residents: Providing Group Minute Greater Than 25% of the Resident's Total Therapy Time Per _Discipline_ during Non-Assessment Periods**
>
> Delivery of group therapy minutes should be no greater than 25% of the resident's total therapy time per discipline for any 7-day look back period.

As the foregoing ramping examples show, RehabCare repeatedly engaged in conduct directly contrary to Ms. Mercer's warnings.  Moreover, Ms. Mercer testified, when she proposed giving training based on her warnings after the merger, her proposal "got canned."  *See* Exhibit 8 at 163-64.

62.     Some RehabCare managers echoed Ms. Mercer's warnings, but there was no

follow up.  For example, in 2011, a RehabCare Area Director became concerned about ramping

at several facilities she managed and reported her concerns to the RehabCare Regional Vice

President, Rona Wiedmayer, but Ms. Wiedmayer took no steps to address the concerns.  In

February 2011, another RehabCare Area Director, Joti Sandhu, sent an e-mail to her Program

Directors, including Amir Tariq at Brighton Gardens, warning them that "[v]ariation of Part A

mins in the assessment and non-assessment is not acceptable."  A copy of Ms. Sandhu's e-mail is

attached as Exhibit 32.  As the foregoing March 2011 example of ramping at Brighton Gardens

shows, however, the practice of ramping continued unabated after Ms. Sandhu's e-mail.  *See*

Paragraph 58(c), *supra*.

63.     Some of RehabCare's clients also expressed concerns about ramping at their

facilities, but, again, RehabCare took no action.  For example, in May 2011, the operator of

Brighton Gardens provided RehabCare with a report from an audit of Brighton Gardens, and a

RehabCare Clinical Operations Consultant then sent an e-mail to her colleagues noting that the

audit had raised concerns about "increased group% outside assessment window."  A copy of this

e-mail is attached as Exhibit 33.  But RehabCare did not then take any steps to correct the

improper billing that had resulted from its ramping practices.  Similarly, in an e-mail to

RehabCare Area Director Carla DiGregorio-Wolfe on August 26, 2011, a Wingate clinical

coordinator observed that, at one Wingate facility, several patients' minutes records showed

evidence of inappropriate ramping.  In response, Ms. DiGregorio-Wolfe acknowledged that one

patient "was ramped way too quickly," another "was ramped quick," and two others had "too

many group minutes."  A copy of this e-mail exchange is in Exhibit 34.  Again, however,

RehabCare did not take any steps to correct the improper billing that had resulted from its
ramping practices.

64.     RehabCare also knew that it was wrong to add a day of therapy during an
assessment reference period in order to hit a RUG, as it did with patients ████████████ at
Villa Valencia, ████████ at Ross Manor, ████████████ at Kateri, ████████████ at
William Hill Manor, and ████████████ at Park Manor.  RehabCare's own training materials
addressed an almost identical hypothetical situation.  In the hypothetical, RehabCare discussed a
patient whose "physician ordered physical and occupational therapy five times a week," but to
whom RehabCare provided six days of therapy during an assessment reference period in order to
hit a targeted RUG.  The RehabCare materials asked, "What is wrong in this situation?" and then
answered that:

> Since the therapy orders specified five times a week, by providing therapy on [an
> additional day], the therapist did not follow the physician orders or the plan of
> care.  Adding additional therapy days to obtain additional therapy minutes could
> be perceived as fraud to obtain more revenue.

A copy of these training materials is in Exhibit 35.  Despite the company's recognition of the
inappropriateness of billing for such therapy, RehabCare Program Directors frequently scheduled
patients for more days of therapy than ordered, and reported billable minutes of therapy to SNFs
that included minutes provided on days in excess of the orders.  Although RehabCare's
sophisticated software identified patients inside assessment periods and rolled over missed
minutes of planned therapy, RehabCare had no safeguards in place to prevent therapists from
providing therapy in excess of therapy orders, and made no efforts to identify instances when this
occurred.

65.     Even after October 1, 2011, when regulatory changes made it far more
challenging to engage in ramping without affecting Medicare reimbursement, RehabCare's focus

on utilization and Ultra High RUG percentage encouraged Program Directors to schedule

therapy without any clinical justification. With RUG levels effectively being reported on a

weekly basis after October 1, 2011, RehabCare Program Directors commonly scheduled patients

to receive extraordinary amounts of therapy on the last day or two of a weekly RUG

measurement period in order to achieve or maintain an Ultra High RUG. The motivation for

scheduling and providing this extra therapy was solely financial, since the patients typically had

been receiving less daily therapy on preceding days and there was no sudden change in their

clinical needs that justified that additional therapy.

66.     Examples of patients who experienced sudden, financially-driven increases in the

amounts of therapy they received on the last day of an assessment or COT period include the

following:

a.     ▮▮▮▮▮▮▮▮▮▮▮ Wingate at Haverhill (Massachusetts)

▮▮▮▮▮▮▮▮▮ was a patient at the Wingate SNF in Haverhill, Massachusetts, in February

2013. The RebabCare Program Director at the facility planned for ▮▮▮▮▮▮ to receive 50

minutes of speech therapy on February 13, 2013, the last day of a COT period for ▮▮▮▮▮▮▮

Had RehabCare provided those 50 minutes of speech therapy, the total amount of therapy

provided to ▮▮▮▮▮▮ would have been 15 minutes short of the minutes necessary for

Wingate to avoid having to report a COT. On the morning of February 13, 2013, after conferring

with a Wingate nurse responsible for submitting MDS forms, a RehabCare technician (who was

not licensed to provide or evaluate the need for therapy) changed the scheduled speech therapy

for ▮▮▮▮▮▮ from 50 minutes to 65 minutes and added a notation "Must get minutes." An

excerpt from that altered schedule is reprinted below:

| Daily Therapy Schedule: Meara, Joan O Meara | | | | | Disc: ST | | |
|---|---|---|---|---|---|---|---|
| **Facility:** Wingate at Haverhill-2784 | | | | | **Date:** 02/13/2013 | | |
| Start Time | End Time | Scheduled Minutes | Rm | Patient Name | Payor | CPT Codes | Minutes/Units |
| End Breakfast ~~150~~ 165 | | | | Must get Minutes | MedA | 92508 - Group speech therapy | / |
| | | | 3x | | | 92526 - Treat oral function | ___/___ |

Planned I/C/G Minutes: 50/0/0
COT Review Date: 02/13/2013 **RUG Level:** M **Total Adjusted Minutes:** 135 (**WARNING:** At risk for Change of Therapy OMRA)

The speech therapist complied with this directive and provided ▓▓▓▓▓▓ with the additional
15 minutes of therapy on February 13, 2013, thereby enabling Wingate to avoid reporting a COT
that would have reduced its Medicare reimbursement and, in turn, RehabCare's payment.  There
was no clinical justification for the addition of 15 minutes to ▓▓▓▓▓▓ s scheduled speech
therapy that day, the amount of therapy reported during that COT period was not reasonable and
necessary, and the resulting RUG claim for the billing period covered by that COT period was
false.  Data reflecting that claim is included in Exhibit 5.

   b. ▓▓▓▓▓▓▓ Regents Park (Boca Raton, FL)

  Below is a table showing the daily minutes of therapy RehabCare reported providing to
patient ▓▓▓▓▓▓ during his stay at the Regents Park of Boca Raton SNF in 2011.

| MCR Day | Date | Day | ARDs | RUG | OT | OT Plan | OT Grp | OT Grp % | PT | PT Plan | PT Grp | PT Grp % | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/4/2011 | Thu | | | 0 | 0 | 0 | 0% | 0 | 0 | 0 | 0% | 0 | 0 | 0 |
| 2 | 8/5/2011 | Fri | 5Day | | 68 | 68 | 0 | 0% | 68 | 68 | 0 | 0% | 136 | 136 | 136 |
| 3 | 8/6/2011 | Sat | 5Day | | 0 | 0 | 0 | 0% | 0 | 0 | 0 | 0% | 0 | 0 | 136 |
| 4 | 8/7/2011 | Sun | 5Day | | 0 | 0 | 0 | 0% | 0 | 0 | 0 | 0% | 0 | 0 | 136 |
| 5 | 8/8/2011 | Mon | 5Day | | 66 | 66 | 0 | 0% | 0 | 0 | 0 | 0% | 66 | 66 | 202 |
| 6 | 8/9/2011 | Tue | 5Day | | 68 | 68 | 0 | 0% | 68 | 68 | 0 | 0% | 136 | 136 | 338 |
| 7 | 8/10/2011 | Wed | 5Day | | 68 | 68 | 0 | 0% | 68 | 68 | 0 | 0% | 136 | 136 | 474 |
| 8 | 8/11/2011 | Thu | 5Day | U | 90 | 90 | 90 | 25% | 156 | 156 | 90 | 25% | 246 | 246 | 720 |
| 9 | 8/12/2011 | Fri | 14Day | | 68 | 68 | 0 | 25% | 68 | 68 | 0 | 25% | 136 | 136 | 720 |
| 10 | 8/13/2011 | Sat | 14Day | | 0 | 0 | 0 | 25% | 0 | 0 | 0 | 25% | 0 | 0 | 720 |
| 11 | 8/14/2011 | Sun | 14Day | U | 0 | 0 | 0 | 25% | 0 | 0 | 0 | 25% | 0 | 0 | 720 |
| 12 | 8/15/2011 | Mon | | | 0 | 0 | 0 | 31% | 60 | 40 | 0 | 21% | 60 | 40 | 692 |
| 13 | 8/16/2011 | Tue | | | 47 | 47 | 0 | 33% | 47 | 47 | 0 | 23% | 94 | 94 | 643 |
| 14 | 8/17/2011 | Wed | | | 47 | 47 | 47 | 54% | 47 | 47 | 0 | 24% | 94 | 94 | 531 |
| 15 | 8/18/2011 | Thu | | | 62 | 62 | 62 | 54% | 62 | 62 | 62 | 22% | 124 | 124 | 437 |
| 16 | 8/19/2011 | Fri | | | 47 | 47 | 0 | 54% | 47 | 47 | 0 | 24% | 94 | 94 | 388 |
| 17 | 8/20/2011 | Sat | | | 0 | 0 | 0 | 54% | 0 | 0 | 0 | 24% | 0 | 0 | 388 |
| 18 | 8/21/2011 | Sun | | | 0 | 0 | 0 | 54% | 0 | 0 | 0 | 24% | 0 | 0 | 388 |
| 19 | 8/22/2011 | Mon | | | 49 | 47 | 0 | 43% | 47 | 47 | 0 | 25% | 96 | 94 | 441 |
| 20 | 8/23/2011 | Tue | | | 47 | 47 | 0 | 43% | 40 | 47 | 0 | 26% | 87 | 94 | 432 |
| 21 | 8/24/2011 | Wed | | | 47 | 47 | 0 | 25% | 47 | 47 | 0 | 26% | 94 | 94 | 493 |
| 22 | 8/25/2011 | Thu | | | 62 | 62 | 62 | 25% | 62 | 62 | 62 | 26% | 124 | 124 | 493 |
| 23 | 8/26/2011 | Fri | | | 40 | 47 | 0 | 25% | 30 | 30 | 0 | 27% | 70 | 77 | 463 |
| 24 | 8/27/2011 | Sat | | | 0 | 0 | 0 | 25% | 0 | 0 | 0 | 27% | 0 | 0 | 463 |
| 25 | 8/28/2011 | Sun | 30Day | | 0 | 0 | 0 | 25% | 0 | 0 | 0 | 27% | 0 | 0 | 463 |
| 26 | 8/29/2011 | Mon | 30Day | | 50 | 50 | 0 | 25% | 47 | 47 | 0 | 27% | 97 | 97 | 464 |
| 27 | 8/30/2011 | Tue | 30Day | | 48 | 48 | 0 | 25% | 49 | 49 | 0 | 26% | 97 | 97 | 477 |
| 28 | 8/31/2011 | Wed | 30Day | | 46 | 46 | 0 | 25% | 48 | 48 | 0 | 26% | 94 | 94 | 477 |
| 29 | 9/1/2011 | Thu | 30Day | | 52 | 52 | 52 | 22% | 62 | 62 | 62 | 26% | 114 | 114 | 468 |
| 30 | 9/2/2011 | Fri | 30Day | | 54 | 54 | 10 | 25% | 44 | 44 | 0 | 25% | 98 | 98 | 500 |
| 31 | 9/3/2011 | Sat | 30Day | V | 0 | 0 | 0 | 25% | 0 | 0 | 0 | 25% | 0 | 0 | 500 |
| 32 | 9/4/2011 | Sun | | | 0 | 0 | 0 | 25% | 0 | 0 | 0 | 25% | 0 | 0 | 500 |
| 33 | 9/5/2011 | Mon | | | 0 | 0 | 0 | 31% | 0 | 0 | 0 | 31% | 0 | 0 | 372 |

As the table indicates, during the first four weekdays ▮▮▮▮▮ received therapy at Regents Park, RehabCare reported providing him with an average of 119 minutes of therapy per day. Then, on the next weekday, which was the last day of the 5-day assessment reference period, RehabCare planned for, and ostensibly provided, 246 minutes of therapy, more than double the prior weekday average. The 246 minutes enabled RehabCare to report having provided ▮▮▮▮▮ with exactly 720 minutes of therapy as of the 5-day ARD, the minimum amount necessary to achieve an Ultra High RUG. Notably, on the following five weekdays, RehabCare ostensibly provided ▮▮▮▮▮ with an average of just 102 minutes of therapy per day. There was no clinical justification for the sharp increase in the amount of therapy for ▮▮▮▮▮ on the 5-day ARD, the amount of therapy billed based on the 5-day assessment was not reasonable and necessary, and the resulting Ultra High RUG claim for the billing period covered by that assessment was false. Data reflecting that claim is included in Exhibit 5.

c. ▮▮▮▮▮▮▮▮ Wingate at Reading (MA)

Below is a table showing the daily minutes of therapy RehabCare reported providing to

patient ▮▮▮▮▮▮▮▮ during her stay at the Wingate SNF in Reading, Massachusetts, in

2013.

| MCR Day | Date | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---------|------|-----|------|-----|-----|---------|-----|---------|-------|------------|-------------------|
| 1 | 4/11/2013 | Thu | | | 0 | 0 | 55 | 0 | 55 | 0 | 55 |
| 2 | 4/12/2013 | Fri | 5Day | | 44 | 44 | 15 | 15 | 59 | 59 | 114 |
| 3 | 4/13/2013 | Sat | 5Day | | 49 | 49 | 0 | 0 | 49 | 49 | 163 |
| 4 | 4/14/2013 | Sun | 5Day | | 0 | 0 | 30 | 30 | 30 | 30 | 193 |
| 5 | 4/15/2013 | Mon | 5Day | | 55 | 45 | 0 | 0 | 55 | 45 | 248 |
| 6 | 4/16/2013 | Tue | 5Day | | 41 | 40 | 50 | 50 | 91 | 90 | 339 |
| 7 | 4/17/2013 | Wed | 5Day | | 55 | 55 | 25 | 25 | 80 | 80 | 419 |
| 8 | 4/18/2013 | Thu | 5Day | V | 100 | 100 | 50 | 50 | 150 | 150 | 514 |
| 9 | 4/19/2013 | Fri | 14Day | | 60 | 60 | 75 | 75 | 135 | 135 | 590 |
| 10 | 4/20/2013 | Sat | 14Day | | 0 | 0 | 45 | 45 | 45 | 45 | 586 |
| 11 | 4/21/2013 | Sun | 14Day | | 63 | 60 | 0 | 0 | 63 | 60 | 619 |
| 12 | 4/22/2013 | Mon | 14Day | | 66 | 65 | 0 | 0 | 66 | 65 | 630 |
| 13 | 4/23/2013 | Tue | 14Day | | 71 | 70 | 70 | 70 | 141 | 140 | 680 |
| 14 | 4/24/2013 | Wed | 14Day | | 32 | 32 | 65 | 65 | 97 | 97 | 697 |
| 15 | 4/25/2013 | Thu | 14Day | U | 90 | 90 | 85 | 85 | 175 | 175 | 722 |
| 16 | 4/26/2013 | Fri | | | 65 | 65 | 0 | 0 | 65 | 65 | 652 |
| 17 | 4/27/2013 | Sat | | | 0 | 0 | 15 | 65 | 15 | 65 | 622 |
| 18 | 4/28/2013 | Sun | | | 45 | 45 | 65 | 65 | 110 | 110 | 669 |
| 19 | 4/29/2013 | Mon | | | 79 | 79 | 42 | 42 | 121 | 121 | 724 |
| 20 | 4/30/2013 | Tue | | | 77 | 75 | 50 | 50 | 127 | 125 | 710 |
| 21 | 5/1/2013 | Wed | | | 40 | 65 | 45 | 65 | 85 | 130 | 698 |
| 22 | 5/2/2013 | Thu | 30Day | | 100 | 100 | 100 | 100 | 200 | 200 | 723 |
| 23 | 5/3/2013 | Fri | 30Day | | 65 | 65 | 0 | 0 | 65 | 65 | 725 |
| 24 | 5/4/2013 | Sat | 30Day | | 0 | 0 | 65 | 65 | 65 | 65 | 773 |
| 25 | 5/5/2013 | Sun | 30Day | | 45 | 45 | 65 | 65 | 110 | 110 | 773 |
| 26 | 5/6/2013 | Mon | 30Day | | 65 | 65 | 45 | 45 | 110 | 110 | 762 |
| 27 | 5/7/2013 | Tue | 30Day | V | 0 | 0 | 0 | 0 | 0 | 0 | 635 |

As the table indicates, RehabCare reported having provided ▮▮▮▮▮ with treatment at the

Ultra High level as of her 14-day ARD (day 15 of her stay) and would have had to report a COT

if it had provided her with therapy at a lower level of intensity during the following week

(ending on day 22 of her stay).  On days 18-21 of her stay, RehabCare reported providing

▮▮▮▮▮ with an average of 111 minutes of therapy per day.  Then, on day 22, the last day of

the COT period, RehabCare ostensibly provided her with 200 minutes of therapy, an 80 percent

increase over the average of the preceding four days.  The 200 minutes enabled RehabCare to

report having provided ▆▆▆▆▆▆ with 723 minutes of therapy as of the last day of the COT

period.  As a result, Wingate avoided reporting a COT that would have reduced its Medicare

reimbursement and, in turn, RehabCare's payment.  There was no clinical justification for the

sharp increase in the amount of therapy for ▆▆▆▆▆▆ on the last day of the COT period, the

amount of therapy billed during that period was not reasonable and necessary, and the resulting

Ultra High RUG claim for that period was false.  Data reflecting that claim is included in Exhibit

5.

         d.      ▆▆▆▆▆▆ Citizens Care (Frederick, MD)

Below is a table showing the minutes of therapy RehabCare reported providing to patient

▆▆▆▆▆▆ during her stay at the Citizens Care SNF in late 2010 and early 2011:

| MCR Day | Date | Day | ARDs | RUG | OT | OT Grp | OT Grp % | PT | PT Grp | PT Grp % | ST | ST Grp | ST Grp % | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11/5/2010 | Fri | | | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0 |
| 2 | 11/6/2010 | Sat | 5Day | | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0 |
| 3 | 11/7/2010 | Sun | 5Day | | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0 |
| 4 | 11/8/2010 | Mon | 5Day | | 49 | 0 | 0% | 30 | 0 | 0% | 52 | 35 | 67% | 131 | 0 | 101.6666667 |
| 5 | 11/9/2010 | Tue | 5Day | | 62 | 62 | 56% | 39 | 39 | 57% | 35 | 0 | 40% | 136 | 0 | 174.6666667 |
| 6 | 11/10/2010 | Wed | 5Day | | 25 | 0 | 46% | 15 | 0 | 46% | 35 | 0 | 29% | 75 | 0 | 274.6666667 |
| 7 | 11/11/2010 | Thu | 5Day | | 55 | 0 | 32% | 80 | 60 | 60% | 35 | 0 | 22% | 170 | 0 | 415.6666667 |
| 8 | 11/12/2010 | Fri | 5Day | V | 58 | 0 | 25% | 55 | 0 | 45% | 35 | 0 | 18% | 148 | 0 | 601 |
| 9 | 11/13/2010 | Sat | 14Day | | 0 | 0 | 25% | 0 | 0 | 45% | 0 | 0 | 18% | 0 | 0 | 601 |
| 10 | 11/14/2010 | Sun | 14Day | | 0 | 0 | 25% | 0 | 0 | 45% | 0 | 0 | 18% | 0 | 0 | 601 |
| 11 | 11/15/2010 | Mon | 14Day | | 45 | 0 | 25% | 55 | 0 | 41% | 35 | 18 | 10% | 135 | 0 | 612.3333333 |
| 12 | 11/16/2010 | Tue | 14Day | | 58 | 58 | 24% | 60 | 30 | 34% | 35 | 0 | 10% | 153 | 0 | 649.3333333 |
| 13 | 11/17/2010 | Wed | 14Day | U | 45 | 0 | 22% | 65 | 0 | 29% | 35 | 0 | 10% | 145 | 0 | 736 |
| 14 | 11/18/2010 | Thu | | | 45 | 0 | 23% | 61 | 0 | 10% | 36 | 0 | 10% | 142 | 0 | 723 |
| 15 | 11/19/2010 | Fri | | | 45 | 0 | 24% | 65 | 0 | 10% | 36 | 0 | 10% | 146 | 0 | 721 |
| 16 | 11/20/2010 | Sat | | | 0 | 0 | 24% | 0 | 0 | 10% | 0 | 0 | 10% | 0 | 0 | 721 |
| 17 | 11/21/2010 | Sun | | | 46 | 0 | 20% | 65 | 65 | 26% | 36 | 0 | 8% | 147 | 0 | 865 |
| 18 | 11/22/2010 | Mon | | | 47 | 32 | 31% | 4 | 0 | 30% | 60 | 0 | 0% | 111 | 0 | 799.3333333 |
| 19 | 11/23/2010 | Tue | | | 0 | 0 | 14% | 65 | 0 | 20% | 55 | 35 | 14% | 120 | 0 | 811 |
| 20 | 11/24/2010 | Wed | | | 15 | 15 | 24% | 65 | 0 | 20% | 21 | 0 | 14% | 101 | 0 | 767 |
| 21 | 11/25/2010 | Thu | | | 0 | 0 | 31% | 0 | 0 | 25% | 0 | 0 | 17% | 0 | 0 | 613.3333333 |
| 22 | 11/26/2010 | Fri | | | 0 | 0 | 44% | 0 | 0 | 33% | 15 | 0 | 19% | 15 | 0 | 447 |
| 23 | 11/27/2010 | Sat | 30Day | | 0 | 0 | 44% | 0 | 0 | 33% | 0 | 0 | 19% | 0 | 0 | 447 |
| 24 | 11/28/2010 | Sun | 30Day | | 0 | 0 | 76% | 0 | 0 | 0% | 0 | 0 | 23% | 0 | 0 | 305 |
| 25 | 11/29/2010 | Mon | 30Day | | 21 | 0 | 42% | 80 | 0 | 0% | 47 | 35 | 51% | 148 | 0 | 328.6666667 |
| 26 | 11/30/2010 | Tue | 30Day | | 21 | 0 | 26% | 47 | 0 | 0% | 41 | 0 | 28% | 109 | 0 | 366.6666667 |
| 27 | 12/1/2010 | Wed | 30Day | | 25 | 25 | 37% | 75 | 0 | 0% | 18 | 0 | 29% | 118 | 0 | 372.6666667 |
| 28 | 12/2/2010 | Thu | 30Day | | 55 | 28 | 43% | 75 | 0 | 0% | 23 | 0 | 24% | 153 | 0 | 513 |
| 29 | 12/3/2010 | Fri | 30Day | U | 75 | 0 | 27% | 78 | 0 | 0% | 60 | 0 | 19% | 213 | 0 | 736 |
| 30 | 12/4/2010 | Sat | | | 0 | 0 | 27% | 0 | 0 | 0% | 0 | 0 | 19% | 0 | 0 | 736 |
| 31 | 12/5/2010 | Sun | | | 0 | 0 | 27% | 0 | 0 | 0% | 0 | 0 | 19% | 0 | 0 | 736 |
| 32 | 12/6/2010 | Mon | | | 44 | 0 | 24% | 44 | 42 | 13% | 35 | 0 | 0% | 123 | 0 | 716 |
| 33 | 12/7/2010 | Tue | | | 48 | 0 | 21% | 53 | 0 | 13% | 42 | 0 | 0% | 143 | 0 | 750 |
| 34 | 12/8/2010 | Wed | | | 47 | 47 | 28% | 50 | 0 | 14% | 0 | 0 | 0% | 97 | 0 | 718.6666667 |
| 35 | 12/9/2010 | Thu | | | 56 | 0 | 17% | 47 | 0 | 15% | 0 | 0 | 0% | 103 | 0 | 679 |
| 36 | 12/10/2010 | Fri | | | 55 | 0 | 19% | 38 | 20 | 27% | 0 | 0 | 0% | 93 | 0 | 553.6666667 |
| 37 | 12/11/2010 | Sat | | | 0 | 0 | 19% | 0 | 0 | 27% | 0 | 0 | 0% | 0 | 0 | 553.6666667 |
| 38 | 12/12/2010 | Sun | | | 0 | 0 | 19% | 0 | 0 | 27% | 0 | 0 | 0% | 0 | 0 | 553.6666667 |
| 39 | 12/13/2010 | Mon | | | 55 | 0 | 18% | 55 | 0 | 8% | 0 | 0 | 0% | 110 | 0 | 546 |
| 40 | 12/14/2010 | Tue | | | 60 | 60 | 39% | 59 | 0 | 8% | 0 | 0 | 0% | 119 | 0 | 470.3333333 |
| 41 | 12/15/2010 | Wed | | | 31 | 0 | 23% | 40 | 0 | 8% | 0 | 0 | 0% | 71 | 0 | 496 |
| 42 | 12/16/2010 | Thu | | | 55 | 0 | 23% | 53 | 0 | 8% | 0 | 0 | 0% | 108 | 0 | 501 |
| 43 | 12/17/2010 | Fri | | | 55 | 0 | 23% | 55 | 0 | 0% | 0 | 0 | 0% | 110 | 0 | 518 |
| 44 | 12/18/2010 | Sat | | | 0 | 0 | 23% | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 518 |
| 45 | 12/19/2010 | Sun | | | 0 | 0 | 23% | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 518 |
| 46 | 12/20/2010 | Mon | | | 47 | 0 | 24% | 65 | 0 | 0% | 0 | 0 | 0% | 112 | 0 | 532 |
| 47 | 12/21/2010 | Tue | | | 49 | 0 | 0% | 82 | 15 | 5% | 0 | 0 | 0% | 131 | 0 | 532 |
| 48 | 12/22/2010 | Wed | | | 45 | 32 | 13% | 76 | 14 | 9% | 0 | 0 | 0% | 121 | 0 | 582 |
| 49 | 12/23/2010 | Thu | | | 46 | 0 | 13% | 63 | 35 | 19% | 0 | 0 | 0% | 109 | 0 | 583 |
| 50 | 12/24/2010 | Fri | | | 16 | 16 | 24% | 22 | 22 | 28% | 0 | 0 | 0% | 38 | 0 | 499 |
| 51 | 12/25/2010 | Sat | | | 0 | 0 | 24% | 0 | 0 | 28% | 0 | 0 | 0% | 0 | 0 | 499 |
| 52 | 12/26/2010 | Sun | | | 0 | 0 | 24% | 0 | 0 | 28% | 0 | 0 | 0% | 0 | 0 | 499 |
| 53 | 12/27/2010 | Mon | 60Day | | 45 | 40 | 44% | 65 | 0 | 28% | 0 | 0 | 0% | 110 | 0 | 446.6666667 |
| 54 | 12/28/2010 | Tue | 60Day | | 55 | 0 | 43% | 68 | 10 | 28% | 0 | 0 | 0% | 123 | 0 | 442.6666667 |
| 55 | 12/29/2010 | Wed | 60Day | | 72 | 0 | 24% | 62 | 37 | 37% | 0 | 0 | 0% | 134 | 0 | 468.6666667 |
| 56 | 12/30/2010 | Thu | 60Day | | 69 | 0 | 22% | 57 | 21 | 33% | 0 | 0 | 0% | 126 | 0 | 502.3333333 |
| 57 | 12/31/2010 | Fri | 60Day | | 40 | 0 | 14% | 32 | 0 | 24% | 0 | 0 | 0% | 72 | 0 | 565 |
| 58 | 1/1/2011 | Sat | 60Day | | 0 | 0 | 14% | 0 | 0 | 24% | 0 | 0 | 0% | 0 | 0 | 565 |
| 59 | 1/2/2011 | Sun | 60Day | V | 0 | 0 | 14% | 0 | 0 | 24% | 0 | 0 | 0% | 0 | 0 | 565 |
| 60 | 1/3/2011 | Mon | | | 57 | 0 | 0% | 52 | 0 | 25% | 0 | 0 | 0% | 109 | 0 | 563.6666667 |

As the table indicates, during the first four weekdays of ▓▓▓▓▓▓'s 30-day assessment reference period, RehabCare reported providing her with an average of 132 minutes of therapy per day.  Then, on the next weekday, which was the last day of the 30-day assessment reference period, RehabCare ostensibly provided her with 213 minutes of therapy, a 62 percent increase over the average on the preceding four weekdays.  The 213 minutes enabled RehabCare to report

having provided ▮▮▮▮▮ with 736 minutes of therapy as of the 30-day ARD, just over the

minimum amount necessary to achieve an Ultra High RUG.  Notably, on the following five

weekdays, RehabCare ostensibly provided ▮▮▮▮▮ with an average of just 112 minutes of

therapy per day.  There was no clinical justification for the sharp increase in the amount of

therapy for ▮▮▮▮▮ on the 30-day ARD, the amount of therapy billed based on the 30-day

assessment was not reasonable and necessary, and the resulting Ultra High RUG claims for the

billing periods covered by that assessment were false.  Data reflecting those claims is included in

Exhibit 5.

67.     RehabCare knew that its practice of suddenly increasing the amount of therapy in

order to hit a targeted RUG was wrong.  A RehabCare presentation from March 2012 made clear

that "[a]djusting delivery of service to achieve a RUG category for an assessment is not

appropriate."  A copy of this presentation is attached as Exhibit 36.  Similarly, Ms. Mack,

RehabCare's Senior Director of Clinical Operations, testified that, "if the only sole reason you

are changing [the amount of therapy delivered] is to achieve payment, I agree that is not

something we would want to happen."  Furthermore, RehabCare's own affiliate, Polaris Group,

conducted audits at RehabCare-served facilities and warned RehabCare that it was engaging in

the practice of manipulating the provision of therapy solely to achieve desired RUG levels.  For

instance, on December 7, 2011, Polaris Group conducted an audit at Blaire House of Milford and

reviewed the records for five Medicare Part A patients.  In a section of the ensuing audit report

entitled "Priorities for Action Planning," the auditor noted that "[o]ne patient appeared to have

OT minutes ramped up the last day of the look-back period.  Treatment time was 15 minutes

higher than any other OT treatment performed (total of 107 minutes). . . .  The Ultra High RUG

was achieved [*i.e.*, the 720 minute threshold was reached] with 5 minutes over. . . . Treatment

immediately following this day dropped to only 20 minutes."  A copy of this audit report is attached as Exhibit 37.  Polaris Group also noted the same pattern in another chart, which showed that a "patient had a treatment of 95 minutes the last day of the look-back period, 22 minutes higher than any other treatment.  [The] Ultra High RUG was achieved with 8 minutes over."  *Id.*  (Tables showing the daily minutes of therapy RehabCare ostensibly provided to these two patients are attached in Exhibits 38 and 39, and data reflecting the claims for each of the aforementioned patients is included in Exhibit 5.)  Because two of the five charts reviewed showed this ramping pattern, the Polaris Group audit report offered the following recommendation:  "Delivering longer treatment minutes at the end of a look-back period should be avoided if subsequent duration is not supported at the higher level."  Exhibit 37 at ESS062370.  Polaris Group sent this report to, among others, RehabCare's Senior Vice President, Jim Douthitt, and its Regional Vice President Rona Wiedmayer.

68.     As described above, however, notwithstanding its professed policy and the warning it received from Polaris Group, RehabCare continued its practice of suddenly increasing the amount of therapy in order to hit a targeted RUG.  For instance, just two months after the Polaris report on ramping at Blaire House of Milford, RehabCare planned that a patient at that SNF, ██████, would have his 14-day ARD on February 14, 2012, but, after five days of that assessment reference period, he had received a total of only 333 minutes of therapy (an average of 67 minutes per day).  So, on the last two days of his 14-day assessment reference period, RehabCare tripled the amount of therapy it claimed to provide to ██████ each day, purportedly delivering 196 minutes of therapy on February 13, 2012, and 198 minutes of therapy on February 14, 2012.  This sudden spike in the amount of therapy purportedly delivered to ██████ caused the SNF to report his 14-day RUG at the Ultra High level.  A detailed table

showing the daily minutes of therapy ▮▮▮▮▮ purportedly received is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2/1/2012 | Wed | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 2/2/2012 | Thu | 5Day | | 45 | 45 | 76 | 45 | 121 | 90 | 121 |
| 3 | 2/3/2012 | Fri | 5Day | | 76 | 75 | 75 | 75 | 151 | 150 | 272 |
| 4 | 2/4/2012 | Sat | 5Day | | 65 | 65 | 65 | 65 | 130 | 130 | 402 |
| 5 | 2/5/2012 | Sun | 5Day | | 35 | 35 | 0 | 0 | 35 | 35 | 437 |
| 6 | 2/6/2012 | Mon | 5Day | | 66 | 65 | 81 | 65 | 147 | 130 | 584 |
| 7 | 2/7/2012 | Tue | 5Day | | 55 | 55 | 36 | 35 | 91 | 90 | 675 |
| 8 | 2/8/2012 | Wed | 5Day | U | 22 | 22 | 30 | 30 | 52 | 52 | 727 |
| 9 | 2/9/2012 | Thu | 14Day | | 76 | 76 | 0 | 0 | 76 | 76 | 682 |
| 10 | 2/10/2012 | Fri | 14Day | | 27 | 27 | 37 | 37 | 64 | 64 | 595 |
| 11 | 2/11/2012 | Sat | 14Day | | 49 | 49 | 56 | 56 | 105 | 105 | 570 |
| 12 | 2/12/2012 | Sun | 14Day | | 36 | 36 | 0 | 0 | 36 | 36 | 571 |
| 13 | 2/13/2012 | Mon | 14Day | | 120 | 120 | 76 | 76 | 196 | 196 | 620 |
| 14 | 2/14/2012 | Tue | 14Day | U | 122 | 120 | 76 | 76 | 198 | 196 | 727 |
| 15 | 2/15/2012 | Wed | OMRA | | 56 | 56 | 37 | 36 | 93 | 92 | 768 |
| 16 | 2/16/2012 | Thu | OMRA | | 56 | 56 | 0 | 0 | 56 | 56 | 748 |
| 17 | 2/17/2012 | Fri | OMRA | | 17 | 15 | 57 | 57 | 74 | 72 | 758 |
| 18 | 2/18/2012 | Sat | OMRA | | 0 | 0 | 30 | 30 | 30 | 30 | 683 |
| 19 | 2/19/2012 | Sun | OMRA | | 56 | 56 | 0 | 0 | 56 | 56 | 703 |
| 20 | 2/20/2012 | Mon | OMRA | | 66 | 66 | 75 | 66 | 141 | 132 | 648 |
| 21 | 2/21/2012 | Tue | OMRA | V | 56 | 56 | 0 | 0 | 56 | 56 | 506 |
| 22 | 2/22/2012 | Wed | 30Day | | 46 | 45 | 45 | 45 | 91 | 90 | 504 |
| 23 | 2/23/2012 | Thu | 30Day | | 91 | 90 | 0 | 0 | 91 | 90 | 539 |
| 24 | 2/24/2012 | Fri | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 465 |
| 25 | 2/25/2012 | Sat | 30Day | | 52 | 45 | 45 | 45 | 97 | 90 | 532 |
| 26 | 2/26/2012 | Sun | 30Day | | 45 | 45 | 0 | 0 | 45 | 45 | 521 |
| 27 | 2/27/2012 | Mon | 30Day | | 68 | 68 | 54 | 52 | 122 | 120 | 502 |
| 28 | 2/28/2012 | Tue | 30Day | V | 54 | 32 | 40 | 32 | 94 | 64 | 540 |
| 29 | 2/29/2012 | Wed | OMRA | | 42 | 42 | 60 | 42 | 102 | 84 | 551 |
| 30 | 3/1/2012 | Thu | OMRA | | 0 | 0 | 15 | 45 | 15 | 45 | 475 |
| 31 | 3/2/2012 | Fri | OMRA | | 0 | 0 | 52 | 60 | 52 | 60 | 527 |
| 32 | 3/3/2012 | Sat | OMRA | | 0 | 0 | 0 | 0 | 0 | 0 | 430 |
| 33 | 3/4/2012 | Sun | OMRA | | 0 | 0 | 0 | 0 | 0 | 0 | 385 |
| 34 | 3/5/2012 | Mon | OMRA | | 0 | 0 | 31 | 28 | 31 | 28 | 294 |
| 35 | 3/6/2012 | Tue | OMRA | M | 0 | 0 | 20 | 20 | 20 | 20 | 220 |
| 36 | 3/7/2012 | Wed | | | 0 | 0 | 0 | 0 | 0 | 0 | 118 |

Data reflecting the claim is included in Exhibit 5.

69.     The subsequent pattern of the delivery of therapy for Blaire House of Milford

patient ▮▮▮▮▮ was similar.  RehabCare planned that ▮▮▮▮▮ would have his 14-day

ARD on May 31, 2012, but, after six days of that assessment reference period, he had received a

total of only 513 minutes of therapy (an average of 86 minutes per day).  So, on the last day of

his 14-day assessment reference period, RehabCare more than doubled the daily amount of

therapy for ▮▮▮▮▮ purportedly delivering 207 minutes of therapy that day.  As with

54

██████████ this sudden spike in the amount of therapy purportedly delivered to ██████████ caused

the SNF to report his 14-day RUG at the Ultra High level.  A detailed table showing the daily

minutes of therapy ██████████ urportedly received is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---------|-----------|-----|------|-----|-----|---------|-----|---------|-------|------------|-------------------|
| 1 | 5/17/2012 | Thu | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 5/18/2012 | Fri | 5Day | | 75 | 75 | 68 | 90 | 143 | 165 | 143 |
| 3 | 5/19/2012 | Sat | 5Day | | 32 | 32 | 0 | 0 | 32 | 32 | 175 |
| 4 | 5/20/2012 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 175 |
| 5 | 5/21/2012 | Mon | 5Day | | 70 | 68 | 70 | 68 | 140 | 136 | 315 |
| 6 | 5/22/2012 | Tue | 5Day | | 73 | 73 | 66 | 66 | 139 | 139 | 454 |
| 7 | 5/23/2012 | Wed | 5Day | | 78 | 78 | 74 | 68 | 144 | 146 | 598 |
| 8 | 5/24/2012 | Thu | 5Day | U | 70 | 98 | 58 | 30 | 128 | 128 | 726 |
| 9 | 5/25/2012 | Fri | 14Day | | 77 | 73 | 68 | 68 | 145 | 141 | 728 |
| 10 | 5/26/2012 | Sat | 14Day | | 62 | 62 | 42 | 42 | 104 | 104 | 800 |
| 11 | 5/27/2012 | Sun | 14Day | | 42 | 42 | 0 | 0 | 42 | 42 | 842 |
| 12 | 5/28/2012 | Mon | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 702 |
| 13 | 5/29/2012 | Tue | 14Day | | 62 | 82 | 62 | 62 | 124 | 144 | 687 |
| 14 | 5/30/2012 | Wed | 14Day | | 83 | 112 | 15 | 15 | 98 | 127 | 641 |
| 15 | 5/31/2012 | Thu | 14Day | U | 133 | 134 | 74 | 74 | 207 | 208 | 720 |
| 16 | 6/1/2012 | Fri | | | 84 | 82 | 85 | 82 | 169 | 164 | 744 |
| 17 | 6/2/2012 | Sat | | | 42 | 42 | 56 | 42 | 98 | 84 | 738 |
| 18 | 6/3/2012 | Sun | | | 32 | 32 | 0 | 0 | 32 | 32 | 728 |
| 19 | 6/4/2012 | Mon | | | 72 | 72 | 30 | 30 | 102 | 102 | 830 |
| 20 | 6/5/2012 | Tue | | | 79 | 78 | 0 | 0 | 79 | 78 | 785 |
| 21 | 6/6/2012 | Wed | | | 78 | 78 | 72 | 72 | 150 | 150 | 837 |
| 22 | 6/7/2012 | Thu | | | 52 | 52 | 42 | 41 | 94 | 93 | 724 |
| 23 | 6/8/2012 | Fri | | | 54 | 43 | 0 | 0 | 54 | 43 | 609 |
| 24 | 6/9/2012 | Sat | | | 48 | 48 | 48 | 48 | 96 | 96 | 607 |
| 25 | 6/10/2012 | Sun | | | 72 | 72 | 0 | 0 | 72 | 72 | 647 |
| 26 | 6/11/2012 | Mon | | | 65 | 65 | 62 | 62 | 127 | 127 | 672 |
| 27 | 6/12/2012 | Tue | | | 43 | 86 | 21 | 34 | 64 | 120 | 657 |

Data reflecting the claims is included in Exhibit 5.

70.     There were also instances where RehabCare realized that it simply would not be

able to achieve a planned RUG for a patient during a weekly measurement period after October

1, 2011.  In those instances, because of RehabCare's directive to provide no more than the

minimum number of minutes of therapy necessary to achieve a RUG, the patients often

experienced sudden swings in the amount of therapy they received.  Harmony Healthcare

International ("Harmony"), an outside consultant for Wingate Healthcare, observed this effect at

a RehabCare-served Wingate facility:

> For me the bigger issue is the minute management as it relates to clinically appropriate care, as soon as they realize they will not hit a RUG the[y] drastically reduce the minutes so as not to over deliver on the lower RUG.  Th[e]n they ramp up to hit the RUG on the next assessment with no[] real documentation or reason for the swing in minutes.

A copy of the Harmony consultant's e-mail is attached as Exhibit 40.  As the Harmony consultant observed, there was no clinical justification for these swings in the amount of therapy RehabCare delivered; rather, RehabCare changed the amounts of therapy solely to meet its utilization targets.  An example of a patient who experienced such a swing is ▮▮▮▮▮▮ ▮▮▮▮▮▮, a patient at the Wingate at Beacon SNF in March and April 2012.  Below is a table showing the daily minutes of therapy that ▮▮▮▮▮▮ received during that stay.

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/5/2012 | Mon | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 3/6/2012 | Tue | 5Day | | 45 | 0 | 60 | 0 | 105 | 0 | 105 |
| 3 | 3/7/2012 | Wed | 5Day | | 70 | 70 | 70 | 70 | 140 | 140 | 245 |
| 4 | 3/8/2012 | Thu | 5Day | | 60 | 60 | 75 | 75 | 135 | 135 | 380 |
| 5 | 3/9/2012 | Fri | 5Day | | 70 | 70 | 70 | 70 | 140 | 140 | 520 |
| 6 | 3/10/2012 | Sat | 5Day | | 0 | 0 | 30 | 30 | 30 | 30 | 550 |
| 7 | 3/11/2012 | Sun | 5Day | | 30 | 30 | 0 | 0 | 30 | 30 | 580 |
| 8 | 3/12/2012 | Mon | 5Day | U | 70 | 70 | 70 | 70 | 140 | 140 | 720 |
| 9 | 3/13/2012 | Tue | | | 65 | 65 | 70 | 70 | 135 | 135 | 750 |
| 10 | 3/14/2012 | Wed | | | 65 | 65 | 65 | 65 | 130 | 130 | 740 |
| 11 | 3/15/2012 | Thu | | | 65 | 65 | 70 | 70 | 135 | 135 | 740 |
| 12 | 3/16/2012 | Fri | 14Day | | 65 | 65 | 65 | 65 | 130 | 130 | 730 |
| 13 | 3/17/2012 | Sat | 14Day | | 30 | 30 | 30 | 30 | 60 | 60 | 760 |
| 14 | 3/18/2012 | Sun | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 730 |
| 15 | 3/19/2012 | Mon | 14Day | | 65 | 65 | 65 | 65 | 130 | 130 | 720 |
| 16 | 3/20/2012 | Tue | 14Day | | 65 | 65 | 70 | 70 | 135 | 135 | 720 |
| 17 | 3/21/2012 | Wed | 14Day | | 66 | 65 | 65 | 65 | 131 | 130 | 721 |
| 18 | 3/22/2012 | Thu | 14Day | U | 70 | 70 | 65 | 65 | 135 | 135 | 721 |
| 19 | 3/23/2012 | Fri | OMRA | | 0 | 0 | 70 | 70 | 70 | 70 | 661 |
| 20 | 3/24/2012 | Sat | OMRA | | 30 | 30 | 30 | 30 | 60 | 60 | 661 |
| 21 | 3/25/2012 | Sun | OMRA | | 65 | 65 | 0 | 0 | 65 | 65 | 726 |
| 22 | 3/26/2012 | Mon | OMRA | | 67 | 65 | 65 | 65 | 132 | 130 | 728 |
| 23 | 3/27/2012 | Tue | OMRA | | 65 | 65 | 65 | 65 | 130 | 130 | 723 |
| 24 | 3/28/2012 | Wed | OMRA | | 40 | 65 | 0 | 0 | 40 | 65 | 632 |
| 25 | 3/29/2012 | Thu | OMRA | V | 15 | 15 | 15 | 15 | 30 | 30 | 527 |
| 26 | 3/30/2012 | Fri | 30Day | | 65 | 65 | 65 | 65 | 130 | 130 | 587 |
| 27 | 3/31/2012 | Sat | 30Day | | 30 | 30 | 30 | 30 | 60 | 60 | 587 |
| 28 | 4/1/2012 | Sun | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 522 |
| 29 | 4/2/2012 | Mon | 30Day | | 70 | 70 | 70 | 70 | 140 | 140 | 530 |
| 30 | 4/3/2012 | Tue | 30Day | | 65 | 65 | 65 | 65 | 130 | 130 | 530 |
| 31 | 4/4/2012 | Wed | 30Day | | 65 | 65 | 65 | 65 | 130 | 130 | 620 |
| 32 | 4/5/2012 | Thu | 30Day | U | 65 | 65 | 65 | 65 | 130 | 130 | 720 |
| 33 | 4/6/2012 | Fri | | | 33 | 30 | 59 | 65 | 92 | 95 | 682 |
| 34 | 4/7/2012 | Sat | | | 30 | 30 | 30 | 30 | 60 | 60 | 682 |
| 35 | 4/8/2012 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 682 |
| 36 | 4/9/2012 | Mon | | | 60 | 60 | 30 | 30 | 90 | 90 | 632 |
| 37 | 4/10/2012 | Tue | | | 0 | 0 | 0 | 0 | 0 | 0 | 502 |

The yellow bands indicate ARD dates, and the orange band indicates a COT reporting date.  As the table shows, for the first 23 days of ▇▇▇▇▇▇'s stay, the Program Director typically planned that she would receive 65 or 70 minutes of physical therapy each weekday.  On the 24th and 25th days of her stay (both non-holiday weekdays), however, the Program Director suddenly dropped the amount of ▇▇▇▇▇▇'s planned physical therapy to 0 and 15 minutes, respectively.  Similarly, the table indicates that, for the first 24 days of ▇▇▇▇▇▇s stay, the Program Director typically planned that she would receive 65 minutes of occupational therapy each weekday.  On the 25th day of her stay, however, the Program Director suddenly dropped the

57

amount of ███████'s planned occupational therapy to 15 minutes.  The drop enabled RehabCare to report a total of 527 minutes of therapy, just over the Very High RUG threshold, as of the 25-day COT.  The week after the 25-day COT, the Program Director resumed planning that ███████ would receive 65 or 70 minutes of both physical and occupational therapy each weekday.  The records of her stay show no clinical justification for the sudden drop in the amount of therapy provided to ███████, nor any clinical justification for the following sudden increase in the amount of therapy provided to her.

71.     Such sudden swings occurred at other RehabCare-served facilities.  An example of another patient who experienced such a clinically unjustified swing is ███████, who, at 89 years-old, was at Ross Manor in December 2012 and January 2013 after a stay in a hospital where she had been admitted with, among other things, dementia, dehydration, and renal failure.  Below is a table showing the daily minutes of therapy that ███████ received during her stay at Ross Manor:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | ST | ST Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/20/2012 | Thu | | | 59 | 0 | 0 | 0 | 0 | 0 | 59 | 0 | 59 |
| 2 | 12/21/2012 | Fri | 5Day | | 76 | 60 | 35 | 60 | 0 | 0 | 111 | 120 | 170 |
| 3 | 12/22/2012 | Sat | 5Day | | 33 | 30 | 30 | 30 | 0 | 0 | 63 | 60 | 233 |
| 4 | 12/23/2012 | Sun | 5Day | | 30 | 30 | 30 | 30 | 0 | 0 | 60 | 60 | 293 |
| 5 | 12/24/2012 | Mon | 5Day | | 60 | 60 | 78 | 65 | 63 | 34 | 201 | 159 | 494 |
| 6 | 12/25/2012 | Tue | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 494 |
| 7 | 12/26/2012 | Wed | 5Day | | 72 | 72 | 50 | 50 | 36 | 34 | 158 | 156 | 652 |
| 8 | 12/27/2012 | Thu | 5Day | U | 65 | 65 | 58 | 58 | 33 | 33 | 156 | 156 | 749 |
| 9 | 12/28/2012 | Fri | 14Day | | 60 | 60 | 35 | 35 | 20 | 15 | 115 | 110 | 753 |
| 10 | 12/29/2012 | Sat | 14Day | | 0 | 0 | 8 | 60 | 0 | 0 | 8 | 60 | 698 |
| 11 | 12/30/2012 | Sun | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 638 |
| 12 | 12/31/2012 | Mon | 14Day | | 50 | 50 | 20 | 20 | 32 | 30 | 102 | 100 | 539 |
| 13 | 1/1/2013 | Tue | 14Day | | 37 | 30 | 0 | 0 | 0 | 0 | 37 | 30 | 576 |
| 14 | 1/2/2013 | Wed | 14Day | V | 36 | 36 | 31 | 31 | 19 | 15 | 86 | 82 | 504 |
| 15 | 1/3/2013 | Thu | OMRA | | 72 | 70 | 45 | 45 | 30 | 30 | 147 | 145 | 495 |
| 16 | 1/4/2013 | Fri | OMRA | | 60 | 60 | 53 | 48 | 30 | 30 | 143 | 138 | 523 |
| 17 | 1/5/2013 | Sat | OMRA | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 515 |
| 18 | 1/6/2013 | Sun | OMRA | | 0 | 0 | 55 | 103 | 0 | 0 | 55 | 103 | 570 |
| 19 | 1/7/2013 | Mon | OMRA | | 60 | 60 | 60 | 55 | 21 | 20 | 141 | 135 | 609 |
| 20 | 1/8/2013 | Tue | OMRA | | 65 | 65 | 0 | 0 | 30 | 30 | 95 | 95 | 667 |
| 21 | 1/9/2013 | Wed | OMRA | U | 65 | 65 | 44 | 44 | 33 | 30 | 142 | 139 | 723 |
| 22 | 1/10/2013 | Thu | | | 61 | 60 | 55 | 55 | 26 | 25 | 142 | 140 | 718 |
| 23 | 1/11/2013 | Fri | | | 60 | 60 | 53 | 53 | 29 | 30 | 142 | 143 | 717 |
| 24 | 1/12/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 717 |
| 25 | 1/13/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 662 |
| 26 | 1/14/2013 | Mon | | | 60 | 60 | 56 | 56 | 30 | 30 | 146 | 146 | 667 |
| 27 | 1/15/2013 | Tue | | | 73 | 73 | 73 | 73 | 0 | 0 | 146 | 146 | 718 |
| 28 | 1/16/2013 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |

The yellow bands indicate ARD dates, and the orange bands indicate COT reporting dates. As the table indicates, RehabCare reported providing ████████ with therapy at the Ultra High RUG level as of her 5-day ARD and as of her first COT date (day 21), but reported providing her with only 504 minutes of therapy, just over the Very High level, as of the intervening ARD (day 14). The table shows that she was generally scheduled for physical and occupational therapy sessions of either 30 or 60 minutes. After the 5-day ARD, her schedule remained consistent, but, on December 29, 2012, she only received 8 minutes of physical therapy even though 60 had been scheduled. Rather than continuing with their typical schedule for ████████ over the next several days, RehabCare scheduled her for fewer minutes of therapy than she usually received. By reducing the number of minutes during the latter half of this assessment period, RehabCare was able to optimize its utilization rate for this patient. Once this 14-day assessment had passed, the program manager immediately began scheduling ████████ for higher amounts of therapy again, and RehabCare reported that, during the next assessment period, it had provided her with

723 minutes of therapy – just over the minimum to bill at the Ultra High RUG level.  There was no

clinical justification for the sudden increase in the amount of therapy provided to ███████████

after her 14-day assessment period, and the claims for those periods are false.  Data reflecting

those claims are included in Exhibit 5.

Focus on Increasing Average Length of Stay in Rehabilitation

72.     Although RehabCare's SNF customers promote their ability to rehabilitate

patients as quickly as possible, RehabCare often evaluated its Program Directors on their ability

to increase, rather than decrease, patients' average lengths of stay at RehabCare-served facilities.

For example, on January 19, 2009, Colleen Jones, a RehabCare Senior Vice President

responsible for the Western United States, sent an e-mail to dozens of RehabCare managers

telling them that one of RehabCare's "key performance indicators" for 2009 would be increasing

average lengths of stay.  A copy of this e-mail is attached as Exhibit 41.  Likewise, RehabCare's

Polaris Group audit affiliate would advise facilities of the "opportunity for improvement"

whenever their average lengths of stay fell below the averages at other facilities.  *See, e.g.,*

Exhibit 42.  Indeed, in describing the "Target" for Medicare Part A average length of stay, the

RehabCare Program Director manual stated that "the majority of patients are on [Medicare Part

A] caseload 35 days."  Exhibit 3 at KHC_RHB-0181714.

73.     Consequently, RehabCare managers regularly encouraged facility Program

Directors and staff to increase average lengths of stay, often without regard for clinical necessity.

For example, in January 2012, a RehabCare Area Director in Massachusetts set a goal of

"increas[ing] area [length of stay] by 2 days year over year."  A copy of the e-mail reflecting this

goal is attached as Exhibit 43.  Then, during a call with her Program Directors on May 7, 2012,

another Massachusetts RehabCare Area Director, Ms. DiGregorio-Wolfe, asked her subordinates

to share their "tricks" for "keeping [patients] in the building longer."

74.     The effects of RehabCare's focus on extending patients' lengths of stay ranged from pressure on therapists to keep patients longer than clinically necessary to more explicit directives from RehabCare Program Directors overruling therapists' recommendations to discharge patients.  In either case, RehabCare's practice artificially increased the size of the ensuing claims to Medicare.

75.     At the Ferncliff SNF in Rhinebeck, New York, the RehabCare Program Director, Mr. Grant, regularly overruled the clinical judgment and discharge recommendations of Ferncliff therapy providers, keeping Medicare Part A patients on therapy for days or weeks after the point in time at which they should have been discharged.  According to one Ferncliff therapy assistant, after she advised Mr. Grant that certain Medicare Part A patients remained on her therapy schedule even after she had recommended they be discharged from therapy, Mr. Grant told her: "'They're staying their 100 days'" (a reference to the limit on the amount of days Medicare covers under the Part A SNF benefit).  Under Mr. Grant's management, according to the therapy assistant, it was often the practice that "Med A patient[s] [were] kept on for at least 100 days unless they died.  Or went out to the hospital."  Another Ferncliff therapy assistant testified that patients she had recommended for discharge continued to receive therapy "[a]ll the time."  Yet another Ferncliff therapy assistant said that Mr. Grant ignored the discharge recommendations of treating therapists "quite often," despite instances where patients either no longer needed therapy, had plateaued, or were so sick that therapy was "unfeasible."  To avoid confrontation with a treating therapy provider when he chose to ignore the provider's discharge recommendation, Mr. Grant often switched the patient in question away from that provider to a new provider who did not know the patient's history.  These practices resulted in the provision of

unnecessary or unreasonable therapy to numerous Ferncliff patients.

76.     The pressure to extend patient length of stay without clinical justification was similar at the Wingate SNF in Haverhill, Massachusetts. The following are examples of Wingate at Haverhill patients whom RehabCare failed to discharge from therapy notwithstanding the clinical recommendations of their treating therapy personnel:

a.            ███████████     Wingate at Haverhill

In early 2013, ███████████ was a 97-year-old patient at the Wingate SNF in Haverhill, Massachusetts, where she had been admitted following a fall at her home. On April 8, 2013, after ███████ had been at the Haverhill SNF for over 70 days, her treating speech therapist recommended that she be discharged from speech therapy on April 10, 2013. A copy of the therapist's note reflecting this recommendation is attached as Exhibit 44. The speech therapist had determined that discharging ███████ on that date was clinically appropriate. Subsequently, however, RehabCare's acting Program Director (who was not a speech therapist) approached the speech therapist and asked her not to discharge ███████ that day, but rather to extend her discharge date by one day to April 11, 2013. A copy of the therapist's note of this conversation is attached as Exhibit 45. Then, on April 10, 2013, a second RehabCare acting Program Director approached the same speech therapist and asked her to extend ███████' speech therapy discharge date by yet another day, to April 12, 2013. *See id*. When the speech therapist asked why she was being asked to delay ███████' discharge date again, the acting Program Director told her that "the 'lookback period' needed to have these [additional] minutes so that they would get a 'bigger reimbursement.'" *Id.* The RehabCare acting Program Director did not provide a clinical justification for extending ███████' discharge date, nor was there any clinical justification. Against the clinical judgment of the speech therapist, the RehabCare

acting Program Director then scheduled ▇▇▇▇ for 40 minutes of speech therapy on April

11, 2013, and 30 minutes of speech therapy on April 12, 2013.  Copies of the speech therapist's

schedules for these dates are attached as Exhibit 47.  The speech therapist subsequently reported

treating ▇▇▇▇ for 41 minutes on April 11, 2013, and 30 minutes on April 12, 2013, for a

total of 71 additional minutes.  Postponing ▇▇▇▇ discharge from speech therapy by two

days and providing her with 71 additional minutes of therapy on those days did, in fact, enable

RehabCare to achieve a "bigger reimbursement," as the RehabCare Program Directors had

intended.  Because of the additional minutes, RehabCare was able to report on April 12, 2013,

▇▇▇▇ next COT reporting date, that during the prior week it had provided her with 723

minutes of total therapy, just over the minimum necessary to maintain her reimbursement at the

Ultra High RUG level.  Because the underlying therapy was not reasonable and necessary, the

claim for the treatment provided during that period was false.  Attached as Exhibit 48 are a copy

of RehabCare's report to Wingate that it treated ▇▇▇▇ at the Ultra High level throughout

her stay and Wingate's subsequent claim to Medicare for that treatment.  Data reflecting the

claims for the aforementioned patient is also included in Exhibit 5.

      b.    ▇▇▇▇, Wingate at Haverhill

On March 2, 2012, ▇▇▇▇, a 93-year-old man, was admitted to Wingate at

Haverhill after being hospitalized with back pain.  On March 5, 2012, he began physical therapy.

On March 20, 2012, his treating physical therapist recommended that he be discharged from

physical therapy.  Nonetheless, consistent with corporate directives from RehabCare and

Wingate to increase lengths of stay in order to increase revenue, RehabCare did not discharge

▇▇▇▇ from physical therapy until March 26, 2012.  The physical therapy provided to

▇▇▇▇ after March 20, 2012, was not reasonable and necessary, and the claim to Medicare

for that treatment was false.  Data reflecting that claim is included in Exhibit 5.

<u>Substituting Physical and Occupational Therapy for Speech Therapy</u>

77.     As their separate training and licensure requirements make clear, physical therapy, occupational therapy, and speech therapy are separate disciplines:  the primary skills of the therapists in each discipline are distinct, as are the clinical issues that each discipline is best equipped to address.

78.     The costs of delivering each therapy discipline can differ, too.  Speech therapy, in particular, was relatively expensive for RehabCare to provide:  because speech therapy was needed less often than the other therapy disciplines, RehabCare often provided speech therapy with independent contractors who were more expensive than employees.  Thus, a RehabCare Area Director commented in 2012 that:  "ST is expensive. . . .  Please manage [the speech therapist's] hours. . . ."  A copy of the e-mail containing this statement is attached as Exhibit 49.

79.     As a consequence of the relatively high cost of providing speech therapy, RehabCare engaged in a practice of scheduling speech therapy more intensively during assessment reference periods.  One independent speech therapist who worked for RehabCare referred to this practice as using speech therapy to "fill the pie."  In other words, RehabCare Program Directors would schedule speech therapy for a patient when it was necessary to obtain additional therapy minutes to achieve a targeted RUG level, not because of the clinical needs of the patient.  As one RehabCare Program Director observed in a December 2011 e-mail to her Area Director, "We have been trying to pull in speech therapy in order to achieve higher RUGS."  A copy of this e-mail is attached as Exhibit 50.

80.     In many cases where a patient was receiving all three therapy disciplines at a RehabCare-served facility, the patient would be discharged from speech therapy long before

being discharged from either of the other two therapy disciplines.  In these circumstances,

RehabCare often engaged in a practice of then increasing the scheduled amounts of therapy from

the other two therapy disciplines so that RehabCare could maintain the patient at the same RUG

level.  There was no clinical justification for providing these increased amounts of physical and

occupational therapy after patients were discharged from speech therapy.  Examples of

RehabCare engaging in this fraudulent practice follow:

> a. ▄▄▄▄▄▄, Terence Cardinal Cooke (New York, NY)

During the first two weeks of patient ▄▄▄▄▄▄'s 2013 stay at the Terence Cardinal

Cooke SNF in New York, the RehabCare Program Director typically planned that ▄▄▄▄▄▄

would receive 60 minutes of occupational therapy, 50 or 60 minutes of physical therapy, and 35

minutes of speech therapy per weekday.  After the speech therapy ended on the 13th day of

▄▄▄▄▄▄s stay, the Program Director suddenly increased the normal schedule of occupational

and physical therapy to 72 minutes of each per weekday.  This increase enabled RehabCare to

continue reporting that it was treating ▄▄▄▄▄▄ at the Ultra High RUG level.  There was no

clinical justification for the increase, however, and the claims based on this increase were false.

A detailed table showing the daily minutes of therapy RehabCare reported providing to

▄▄▄▄▄▄ is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | ST | ST Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2/28/2013 | Thu | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 3/1/2013 | Fri | 5Day | | 45 | 0 | 45 | 0 | 0 | 0 | 90 | 0 | 90 |
| 3 | 3/2/2013 | Sat | 5Day | | 60 | 0 | 60 | 0 | 0 | 0 | 120 | 0 | 210 |
| 4 | 3/3/2013 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 210 |
| 5 | 3/4/2013 | Mon | 5Day | | 60 | 60 | 60 | 60 | 0 | 0 | 120 | 120 | 330 |
| 6 | 3/5/2013 | Tue | 5Day | | 60 | 60 | 60 | 60 | 0 | 0 | 120 | 120 | 450 |
| 7 | 3/6/2013 | Wed | 5Day | | 75 | 75 | 52 | 52 | 45 | 15 | 172 | 142 | 622 |
| 8 | 3/7/2013 | Thu | 5Day | U | 60 | 60 | 50 | 50 | 35 | 35 | 145 | 145 | 767 |
| 9 | 3/8/2013 | Fri | 14Day | | 60 | 60 | 50 | 50 | 35 | 35 | 145 | 145 | 822 |
| 10 | 3/9/2013 | Sat | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 702 |
| 11 | 3/10/2013 | Sun | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 702 |
| 12 | 3/11/2013 | Mon | 14Day | | 60 | 60 | 50 | 50 | 35 | 35 | 145 | 145 | 727 |
| 13 | 3/12/2013 | Tue | 14Day | U | 60 | 60 | 50 | 50 | 35 | 35 | 145 | 145 | 752 |
| 14 | 3/13/2013 | Wed | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 727 |
| 15 | 3/14/2013 | Thu | | | 75 | 72 | 48 | 48 | 0 | 0 | 123 | 120 | 705 |
| 16 | 3/15/2013 | Fri | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 707 |
| 17 | 3/16/2013 | Sat | | | 0 | 0 | 32 | 30 | 0 | 0 | 32 | 30 | 739 |
| 18 | 3/17/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 739 |
| 19 | 3/18/2013 | Mon | | | 75 | 75 | 72 | 72 | 0 | 0 | 147 | 147 | 741 |
| 20 | 3/19/2013 | Tue | | | 65 | 65 | 65 | 65 | 0 | 0 | 130 | 130 | 726 |
| 21 | 3/20/2013 | Wed | 30Day | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 726 |
| 22 | 3/21/2013 | Thu | 30Day | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 750 |
| 23 | 3/22/2013 | Fri | 30Day | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 750 |
| 24 | 3/23/2013 | Sat | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 718 |
| 25 | 3/24/2013 | Sun | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 718 |
| 26 | 3/25/2013 | Mon | 30Day | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 718 |
| 27 | 3/26/2013 | Tue | 30Day | U | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 735 |
| 28 | 3/27/2013 | Wed | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 588 |
| 29 | 3/28/2013 | Thu | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 588 |
| 30 | 3/29/2013 | Fri | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 588 |
| 31 | 3/30/2013 | Sat | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 732 |
| 32 | 3/31/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 732 |
| 33 | 4/1/2013 | Mon | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 729 |
| 34 | 4/2/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 726 |
| 35 | 4/3/2013 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 870 |
| 36 | 4/4/2013 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 867 |
| 37 | 4/5/2013 | Fri | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 864 |
| 38 | 4/6/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 39 | 4/7/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 40 | 4/8/2013 | Mon | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 723 |
| 41 | 4/9/2013 | Tue | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 726 |
| 42 | 4/10/2013 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 726 |
| 43 | 4/11/2013 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 726 |
| 44 | 4/12/2013 | Fri | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 726 |
| 45 | 4/13/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 726 |
| 46 | 4/14/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 726 |
| 47 | 4/15/2013 | Mon | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 726 |
| 48 | 4/16/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 723 |
| 49 | 4/17/2013 | Wed | | | 50 | 50 | 50 | 50 | 0 | 0 | 100 | 100 | 679 |
| 50 | 4/18/2013 | Thu | | | 30 | 30 | 0 | 0 | 0 | 0 | 30 | 30 | 565 |
| 51 | 4/19/2013 | Fri | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 421 |

Included in Exhibit 5 is data reflecting the claims that the Terence Cardinal Cooke SNF

submitted for ostensibly providing care to ▮▮▮▮▮ at the Ultra High RUG level throughout

her stay.

b.   ▮▮▮▮▮   Terence Cardinal Cooke (New York, NY)



During the first 11 days of patient ████████'s 2013 stay at the Terence Cardinal Cooke SNF in New York, the RehabCare Program Director typically planned that ████████ would receive 40 minutes of occupational therapy, 40 minutes of physical therapy, and 30 minutes of speech therapy per weekday.  When the speech therapy ended on the 11th day of ████████'s stay, the Program Director suddenly increased the normal schedule of occupational and physical therapy to 72 minutes of each per weekday.  This increase enabled RehabCare to continue reporting that it was treating ████████ at the Ultra High RUG level.  There was no clinical justification for the increase, however, and the claims based on this increase were false. A detailed table showing the daily minutes of therapy RehabCare reported providing to ████████ is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | ST | ST Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7/5/2013 | Fri | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 7/6/2013 | Sat | 5Day | | 71 | 0 | 72 | 0 | 0 | 0 | 143 | 0 | 143 |
| 3 | 7/7/2013 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 143 |
| 4 | 7/8/2013 | Mon | 5Day | | 50 | 50 | 50 | 50 | 45 | 30 | 145 | 130 | 288 |
| 5 | 7/9/2013 | Tue | 5Day | | 40 | 40 | 40 | 40 | 30 | 30 | 110 | 110 | 398 |
| 6 | 7/10/2013 | Wed | 5Day | | 40 | 40 | 40 | 40 | 30 | 30 | 110 | 110 | 508 |
| 7 | 7/11/2013 | Thu | 5Day | | 40 | 40 | 40 | 40 | 30 | 30 | 110 | 110 | 618 |
| 8 | 7/12/2013 | Fri | 5Day | U | 60 | 60 | 60 | 60 | 30 | 30 | 150 | 150 | 768 |
| 9 | 7/13/2013 | Sat | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625 |
| 10 | 7/14/2013 | Sun | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 625 |
| 11 | 7/15/2013 | Mon | 14Day | | 72 | 72 | 72 | 72 | 30 | 30 | 174 | 174 | 654 |
| 12 | 7/16/2013 | Tue | 14Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 688 |
| 13 | 7/17/2013 | Wed | 14Day | U | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 722 |
| 14 | 7/18/2013 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 756 |
| 15 | 7/19/2013 | Fri | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 750 |
| 16 | 7/20/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 750 |
| 17 | 7/21/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 750 |
| 18 | 7/22/2013 | Mon | | | 72 | 72 | 72 | 57 | 0 | 0 | 144 | 129 | 720 |
| 19 | 7/23/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 20 | 7/24/2013 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 21 | 7/25/2013 | Thu | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 22 | 7/26/2013 | Fri | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 23 | 7/27/2013 | Sat | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 24 | 7/28/2013 | Sun | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 25 | 7/29/2013 | Mon | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 26 | 7/30/2013 | Tue | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 27 | 7/31/2013 | Wed | 30Day | U | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 28 | 8/1/2013 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 29 | 8/2/2013 | Fri | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 723 |
| 30 | 8/3/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 723 |
| 31 | 8/4/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 723 |
| 32 | 8/5/2013 | Mon | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 723 |
| 33 | 8/6/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 723 |
| 34 | 8/7/2013 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 723 |
| 35 | 8/8/2013 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 723 |
| 36 | 8/9/2013 | Fri | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 37 | 8/10/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 38 | 8/11/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 39 | 8/12/2013 | Mon | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 40 | 8/13/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 41 | 8/14/2013 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 42 | 8/15/2013 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 43 | 8/16/2013 | Fri | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 576 |

Included in Exhibit 5 is data showing the claims that the Terence Cardinal Cooke SNF submitted for ostensibly providing care to ▆▆▆▆ at the Ultra High RUG level throughout his stay.

      c.     ▆▆▆▆, Bedford Court (Silver Spring, MD)

During the first 23 days of patient ▆▆▆▆'s 2011 stay at the Bedford Court SNF in Silver Spring, Maryland, the RehabCare Program Director typically planned that ▆▆▆▆ would receive 50 minutes of occupational therapy, 50 minutes of physical therapy, and 35 or 40 minutes of speech therapy per weekday. After the speech therapy ended on the 23rd day of ▆▆▆▆'s stay, the Program Director suddenly increased the normal schedule of occupational

and physical therapy to 70 or 72 minutes of each per weekday.  This increase enabled RehabCare

to continue reporting that it was treating ▓▓▓▓▓ at the Ultra High RUG level.  There was no

clinical justification for the increase, however, and the claims based on this increase were false.

A detailed table showing the daily minutes of therapy RehabCare reported providing to

▓▓▓▓▓ is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | ST | ST Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/23/2011 | Tue | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 8/24/2011 | Wed | 5Day | | 54 | 54 | 48 | 48 | 40 | 40 | 142 | 142 | 142 |
| 3 | 8/25/2011 | Thu | 5Day | | 55 | 55 | 66 | 66 | 35 | 35 | 156 | 156 | 298 |
| 4 | 8/26/2011 | Fri | 5Day | | 0 | 0 | 59 | 55 | 35 | 35 | 94 | 90 | 392 |
| 5 | 8/27/2011 | Sat | 5Day | | 50 | 50 | 0 | 0 | 0 | 0 | 50 | 50 | 442 |
| 6 | 8/28/2011 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 442 |
| 7 | 8/29/2011 | Mon | 5Day | | 65 | 50 | 50 | 50 | 40 | 40 | 155 | 140 | 597 |
| 8 | 8/30/2011 | Tue | 5Day | U | 85 | 85 | 0 | 0 | 40 | 40 | 125 | 125 | 722 |
| 9 | 8/31/2011 | Wed | 14Day | | 50 | 50 | 50 | 50 | 40 | 40 | 140 | 140 | 720 |
| 10 | 9/1/2011 | Thu | 14Day | | 50 | 50 | 50 | 50 | 35 | 35 | 135 | 135 | 699 |
| 11 | 9/2/2011 | Fri | 14Day | | 40 | 40 | 40 | 40 | 35 | 35 | 115 | 115 | 720 |
| 12 | 9/3/2011 | Sat | 14Day | U | 0 | 0 | 51 | 51 | 0 | 0 | 51 | 51 | 721 |
| 13 | 9/4/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 721 |
| 14 | 9/5/2011 | Mon | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 566 |
| 15 | 9/6/2011 | Tue | | | 51 | 50 | 51 | 50 | 40 | 40 | 142 | 140 | 583 |
| 16 | 9/7/2011 | Wed | | | 56 | 50 | 54 | 50 | 40 | 40 | 150 | 140 | 593 |
| 17 | 9/8/2011 | Thu | | | 50 | 50 | 50 | 50 | 40 | 40 | 140 | 140 | 598 |
| 18 | 9/9/2011 | Fri | | | 36 | 50 | 50 | 50 | 25 | 40 | 111 | 140 | 594 |
| 19 | 9/10/2011 | Sat | | | 50 | 30 | 50 | 50 | 0 | 0 | 100 | 80 | 643 |
| 20 | 9/11/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 643 |
| 21 | 9/12/2011 | Mon | | | 35 | 35 | 35 | 35 | 20 | 20 | 90 | 90 | 733 |
| 22 | 9/13/2011 | Tue | | | 45 | 45 | 45 | 45 | 35 | 35 | 125 | 125 | 716 |
| 23 | 9/14/2011 | Wed | | | 50 | 50 | 50 | 50 | 35 | 35 | 135 | 135 | 701 |
| 24 | 9/15/2011 | Thu | 30Day | | 74 | 72 | 72 | 72 | 0 | 0 | 146 | 144 | 707 |
| 25 | 9/16/2011 | Fri | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 740 |
| 26 | 9/17/2011 | Sat | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 640 |
| 27 | 9/18/2011 | Sun | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 640 |
| 28 | 9/19/2011 | Mon | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 694 |
| 29 | 9/20/2011 | Tue | 30Day | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 713 |
| 30 | 9/21/2011 | Wed | 30Day | U | 73 | 72 | 72 | 72 | 0 | 0 | 145 | 144 | 723 |
| 31 | 9/22/2011 | Thu | | | 70 | 70 | 78 | 70 | 0 | 0 | 148 | 140 | 725 |
| 32 | 9/23/2011 | Fri | | | 70 | 70 | 71 | 70 | 0 | 0 | 141 | 140 | 722 |
| 33 | 9/24/2011 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 722 |
| 34 | 9/25/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 722 |
| 35 | 9/26/2011 | Mon | | | 0 | 0 | 70 | 70 | 0 | 0 | 70 | 70 | 648 |
| 36 | 9/27/2011 | Tue | | | 70 | 70 | 70 | 70 | 0 | 0 | 140 | 140 | 644 |
| 37 | 9/28/2011 | Wed | | | 71 | 70 | 73 | 70 | 0 | 0 | 144 | 140 | 643 |

Included in Exhibit 5 is data showing the claims that the Bedford Court SNF submitted for

ostensibly providing care to ▓▓▓▓▓ at the Ultra High RUG level throughout his stay.

        d.  ▓▓▓▓▓, Broomall Rehabilitation and Nursing Center (Broomall, PA)

▓▓▓▓▓ was 92-years-old and a long-term resident of Broomall Rehabilitation and

Nursing Center in Broomall, Pennsylvania.  During the first 29 days of ▓▓▓▓▓'s Medicare

Part A stay starting on September 16, 2011, the RehabCare Program Director typically planned that ▮▮▮▮▮▮ would receive 55 minutes of occupational therapy, 55 minutes of physical therapy, and 35 minutes of speech therapy per weekday.  After the speech therapy ended on the 29th day of ▮▮▮▮▮▮ s stay, RehabCare suddenly began providing 72 minutes each of occupational and physical therapy per weekday.  This increase enabled RehabCare to continue reporting that it was treating ▮▮▮▮▮▮ at the Ultra High RUG level.  There was no clinical justification for the increase however, and the claims based on this increase were false.  A detailed table showing the daily minutes of therapy RehabCare reported providing to ▮▮▮▮▮▮ is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | ST | ST Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/16/2011 | Fri | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 9/17/2011 | Sat | 5Day | | 0 | 0 | 45 | 0 | 30 | 0 | 75 | 0 | 75 |
| 3 | 9/18/2011 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 |
| 4 | 9/19/2011 | Mon | 5Day | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 220 |
| 5 | 9/20/2011 | Tue | 5Day | | 55 | 55 | 0 | 0 | 35 | 35 | 90 | 90 | 310 |
| 6 | 9/21/2011 | Wed | 5Day | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 455 |
| 7 | 9/22/2011 | Thu | 5Day | | 55 | 55 | 60 | 55 | 35 | 35 | 150 | 145 | 605 |
| 8 | 9/23/2011 | Fri | 5Day | U | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 750 |
| 9 | 9/24/2011 | Sat | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 675 |
| 10 | 9/25/2011 | Sun | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 675 |
| 11 | 9/26/2011 | Mon | 14Day | | 55 | 55 | 56 | 55 | 37 | 35 | 148 | 145 | 678 |
| 12 | 9/27/2011 | Tue | 14Day | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 733 |
| 13 | 9/28/2011 | Wed | 14Day | U | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 733 |
| 14 | 9/29/2011 | Thu | | | 55 | 110 | 60 | 55 | 35 | 35 | 150 | 200 | 733 |
| 15 | 9/30/2011 | Fri | | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 733 |
| 16 | 10/1/2011 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 733 |
| 17 | 10/2/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 733 |
| 18 | 10/3/2011 | Mon | | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 730 |
| 19 | 10/4/2011 | Tue | | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 730 |
| 20 | 10/5/2011 | Wed | | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 730 |
| 21 | 10/6/2011 | Thu | | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 725 |
| 22 | 10/7/2011 | Fri | | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 725 |
| 23 | 10/8/2011 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 725 |
| 24 | 10/9/2011 | Sun | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 725 |
| 25 | 10/10/2011 | Mon | 30Day | | 55 | 55 | 55 | 55 | 34 | 35 | 144 | 145 | 724 |
| 26 | 10/11/2011 | Tue | 30Day | | 55 | 55 | 55 | 55 | 34 | 35 | 144 | 145 | 723 |
| 27 | 10/12/2011 | Wed | 30Day | | 55 | 55 | 55 | 55 | 34 | 35 | 144 | 145 | 722 |
| 28 | 10/13/2011 | Thu | 30Day | | 55 | 55 | 55 | 55 | 34 | 35 | 144 | 145 | 721 |
| 29 | 10/14/2011 | Fri | 30Day | | 55 | 55 | 55 | 55 | 35 | 35 | 145 | 145 | 721 |
| 30 | 10/15/2011 | Sat | 30Day | U | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 721 |
| 31 | 10/16/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 721 |
| 32 | 10/17/2011 | Mon | | | 72 | 55 | 72 | 55 | 0 | 0 | 144 | 110 | 721 |
| 33 | 10/18/2011 | Tue | | | 72 | 55 | 72 | 55 | 0 | 0 | 144 | 110 | 721 |
| 34 | 10/19/2011 | Wed | | | 72 | 55 | 72 | 55 | 0 | 0 | 144 | 110 | 721 |
| 35 | 10/20/2011 | Thu | | | 72 | 55 | 72 | 55 | 0 | 0 | 144 | 110 | 721 |
| 36 | 10/21/2011 | Fri | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 37 | 10/22/2011 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 38 | 10/23/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 39 | 10/24/2011 | Mon | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 40 | 10/25/2011 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 41 | 10/26/2011 | Wed | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 42 | 10/27/2011 | Thu | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 43 | 10/28/2011 | Fri | | | 50 | 72 | 72 | 72 | 0 | 0 | 122 | 144 | 698 |
| 44 | 10/29/2011 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 698 |
| 45 | 10/30/2011 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 698 |
| 46 | 10/31/2011 | Mon | | | 50 | 72 | 50 | 72 | 0 | 0 | 100 | 144 | 654 |
| 47 | 11/1/2011 | Tue | | | 51 | 72 | 50 | 72 | 0 | 0 | 101 | 144 | 611 |
| 48 | 11/2/2011 | Wed | | | 17 | 72 | 15 | 72 | 0 | 0 | 32 | 144 | 499 |

Included in Exhibit 5 is data showing the claims that Broomall Rehabilitation and Nursing

Center submitted for ostensibly providing care to  at the Ultra High RUG level

throughout all but the last several days of her stay.

       e.           Citizens Care (Frederick, MD)

During the first 12 days of patient ⬛⬛⬛⬛⬛ stay at the Citizens Care SNF in

Frederick, Maryland, the RehabCare Program Director typically planned that ▮▮▮▮▮ would receive 55 minutes or less of occupational therapy, 55 minutes or less of physical therapy, and 45 minutes or less of speech therapy per weekday.  After the speech therapy ended on the 13th day of ▮▮▮▮▮ stay, the RehabCare Program Director suddenly increased the normal schedule of occupational and physical therapy to 72 minutes of each discipline per weekday.  This increase enabled RehabCare to continue reporting that it was treating ▮▮▮▮▮ at the Ultra High RUG level.  There was no clinical justification for the increase in physical or occupational therapy, however, and the claims for therapy based on those increases were false.  A detailed table showing the daily minutes of therapy RehabCare reported providing to ▮▮▮▮▮ is below:

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | ST | ST Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/4/2013 | Wed | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 9/5/2013 | Thu | 5Day | | 40 | 55 | 50 | 55 | 55 | 35 | 145 | 145 | 145 |
| 3 | 9/6/2013 | Fri | 5Day | | 48 | 55 | 55 | 55 | 40 | 35 | 143 | 145 | 288 |
| 4 | 9/7/2013 | Sat | 5Day | | 35 | 35 | 0 | 0 | 0 | 0 | 35 | 35 | 323 |
| 5 | 9/8/2013 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 323 |
| 6 | 9/9/2013 | Mon | 5Day | | 23 | 45 | 45 | 45 | 35 | 35 | 103 | 125 | 426 |
| 7 | 9/10/2013 | Tue | 5Day | | 55 | 55 | 55 | 55 | 45 | 45 | 155 | 155 | 581 |
| 8 | 9/11/2013 | Wed | 5Day | U | 59 | 55 | 55 | 55 | 45 | 45 | 159 | 155 | 740 |
| 9 | 9/12/2013 | Thu | 14Day | | 41 | 45 | 55 | 55 | 17 | 15 | 113 | 115 | 708 |
| 10 | 9/13/2013 | Fri | 14Day | | 55 | 55 | 0 | 0 | 15 | 15 | 70 | 70 | 635 |
| 11 | 9/14/2013 | Sat | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 600 |
| 12 | 9/15/2013 | Sun | 14Day | | 30 | 30 | 0 | 0 | 0 | 0 | 30 | 30 | 630 |
| 13 | 9/16/2013 | Mon | 14Day | U | 76 | 75 | 75 | 75 | 45 | 45 | 196 | 195 | 723 |
| 14 | 9/17/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 712 |
| 15 | 9/18/2013 | Wed | | | 78 | 72 | 72 | 72 | 0 | 0 | 150 | 144 | 703 |
| 16 | 9/19/2013 | Thu | | | 60 | 60 | 72 | 72 | 0 | 0 | 132 | 132 | 722 |
| 17 | 9/20/2013 | Fri | | | 72 | 72 | 60 | 50 | 0 | 0 | 132 | 122 | 784 |
| 18 | 9/21/2013 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 784 |
| 19 | 9/22/2013 | Sun | | | 0 | 0 | 32 | 30 | 0 | 0 | 32 | 30 | 786 |
| 20 | 9/23/2013 | Mon | | | 65 | 65 | 65 | 65 | 0 | 0 | 130 | 130 | 720 |
| 21 | 9/24/2013 | Tue | | | 72 | 72 | 72 | 72 | 0 | 0 | 144 | 144 | 720 |
| 22 | 9/25/2013 | Wed | | | 75 | 72 | 72 | 72 | 0 | 0 | 147 | 144 | 717 |
| 23 | 9/26/2013 | Thu | | | 38 | 40 | 72 | 72 | 0 | 0 | 110 | 112 | 695 |
| 24 | 9/27/2013 | Fri | | | 72 | 72 | 73 | 72 | 0 | 0 | 145 | 144 | 708 |
| 25 | 9/28/2013 | Sat | | | 43 | 35 | 0 | 0 | 0 | 0 | 43 | 35 | 751 |
| 26 | 9/29/2013 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 719 |
| 27 | 9/30/2013 | Mon | | | 72 | 72 | 66 | 72 | 0 | 0 | 138 | 144 | 727 |
| 28 | 10/1/2013 | Tue | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 583 |

Included in Exhibit 5 is data showing the claims that the Citizens Care SNF submitted for ostensibly providing care to ▮▮▮▮▮ at the Ultra High RUG level throughout her stay.

<u>Reporting Rounded or Suspiciously Consistent Minutes of Therapy</u>

81.     RehabCare's therapists often reported that they provided therapy in amounts that

demonstrated improbable patterns of therapy delivery that RehabCare's affiliate, Polaris Group, warned were improper.  As many of the charts in the previous section show, therapists often reported that they provided exactly the planned amount of minutes.  Other therapists rounded to the nearest five-minute increment.

82.     Polaris Group began warning RehabCare about these practices of "rounded minutes" or "consistent minutes" as early as 2009.  In a report from an audit of the Blaire House of Milford SNF on December 15, 2009, Polaris Group pointed out that rounding minutes was improper and prohibited by the RAI Manual:  "The RAI manual clearly states 'actual minutes'. The RAI manual . . . includes language to 'not round to the nearest 5-minute increment.'"[5]  A copy of this audit report is attached as Exhibit 63.

83.     In another audit report on December 5, 2011, concerning Brandon Woods at Dartmouth, a Polaris Group auditor highlighted a patient where "a majority of treatments [were] at exactly 72 minutes in duration," and the auditor then warned that "actual minutes of treatment should be recorded."[6]  A copy of this audit report is attached as Exhibit 64. Despite this warning, audits at Brandon Woods of Dartmouth found recurring instances of RehabCare failing to report actual minutes of therapy in 2012 and 2013.  *See* Exhibit 65 (October 4, 2012 Audit) ("A pattern was discovered of rounding treatments to either the nearest 5 minute increment, or the same number of treatment minutes for multiple treatments.  Seventy-two was a favorite number for treatment duration.  Each patient reviewed had some pattern of rounding the treatment duration.

---

[5]  The full text of the relevant provision of the RAI Manual states:  "Record the actual minutes of therapy.  **Do not round therapy minutes (e.g., reporting [] to the nearest 5th minute[)].**" RAI Manual, Ch. 3 at O-19 (Oct. 2013) (emphasis in original).

[6]  Notably, where 72 minutes are provided across two therapy disciplines each weekday for one week, the total amounts to 720 minutes – exactly the minimum necessary to achieve the Ultra High RUG.

Eight of the 11 MDSs were within 10 minutes of the minimum number of minutes needed to achieve the Rehab RUG. . . . *Recommendation*:  Actual minutes of treatment should be recorded.”); Exhibit 66 (November 5, 2013, Audit) (“All charts audited had rounding of total minutes per day. . . . *Recommendation*:  Actual minutes should be recorded.”).

84.      In a report from an audit on December 6, 2011, Polaris Group likewise alerted RehabCare that, at the Brandon Woods of New Bedford SNF, there was a pattern for some patients where “PT and OT us[ed] the same duration for multiple treatments,” and “one patient had a majority of treatments at exactly 72 minutes in duration.”  A copy of this audit report is attached as Exhibit 67.  Again, RehabCare did not correct the practice of failing to report actual minutes of therapy delivered.  By way of example, as the table below shows, RehabCare purportedly provided Brandon Woods of New Bedford patient ███████████ with exactly 72 minutes of occupational therapy five days a week for more than seven weeks during May and June 2012.

| MCR Day | Date Range | Day | ARDs | RUG | OT | OT Plan | PT | PT Plan | TOTAL | TOTAL PLAN | LOOK-BACK MINUTES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/2/2012 | Wed | | | 40 | 0 | 0 | 0 | 40 | 0 | 40 |
| 2 | 5/3/2012 | Thu | 5Day | | 72 | 72 | 72 | 72 | 144 | 144 | 184 |
| 3 | 5/4/2012 | Fri | 5Day | | 72 | 72 | 72 | 72 | 144 | 144 | 328 |
| 4 | 5/5/2012 | Sat | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 328 |
| 5 | 5/6/2012 | Sun | 5Day | | 0 | 0 | 0 | 0 | 0 | 0 | 328 |
| 6 | 5/7/2012 | Mon | 5Day | | 72 | 72 | 72 | 72 | 144 | 144 | 472 |
| 7 | 5/8/2012 | Tue | 5Day | | 72 | 72 | 72 | 72 | 144 | 144 | 616 |
| 8 | 5/9/2012 | Wed | 5Day | U | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 9 | 5/10/2012 | Thu | 14Day | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 10 | 5/11/2012 | Fri | 14Day | | 72 | 72 | 73 | 72 | 145 | 144 | 721 |
| 11 | 5/12/2012 | Sat | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 721 |
| 12 | 5/13/2012 | Sun | 14Day | | 0 | 0 | 0 | 0 | 0 | 0 | 721 |
| 13 | 5/14/2012 | Mon | 14Day | | 72 | 72 | 72 | 72 | 144 | 144 | 721 |
| 14 | 5/15/2012 | Tue | 14Day | U | 72 | 72 | 72 | 72 | 144 | 144 | 721 |
| 15 | 5/16/2012 | Wed | | | 72 | 72 | 73 | 72 | 145 | 144 | 722 |
| 16 | 5/17/2012 | Thu | | | 72 | 72 | 73 | 72 | 145 | 144 | 723 |
| 17 | 5/18/2012 | Fri | | | 72 | 72 | 73 | 72 | 145 | 144 | 723 |
| 18 | 5/19/2012 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 723 |
| 19 | 5/20/2012 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 723 |
| 20 | 5/21/2012 | Mon | | | 72 | 72 | 72 | 72 | 144 | 144 | 723 |
| 21 | 5/22/2012 | Tue | | | 72 | 72 | 72 | 72 | 144 | 144 | 723 |
| 22 | 5/23/2012 | Wed | 30Day | | 72 | 72 | 72 | 72 | 144 | 144 | 722 |
| 23 | 5/24/2012 | Thu | 30Day | | 72 | 72 | 73 | 72 | 145 | 144 | 722 |
| 24 | 5/25/2012 | Fri | 30Day | | 72 | 143 | 0 | 0 | 72 | 143 | 649 |
| 25 | 5/26/2012 | Sat | 30Day | | 0 | 0 | 72 | 72 | 72 | 72 | 721 |
| 26 | 5/27/2012 | Sun | 30Day | | 0 | 0 | 0 | 0 | 0 | 0 | 721 |
| 27 | 5/28/2012 | Mon | 30Day | | 72 | 143 | 72 | 144 | 144 | 287 | 721 |
| 28 | 5/29/2012 | Tue | 30Day | U | 72 | 72 | 72 | 72 | 144 | 144 | 721 |
| 29 | 5/30/2012 | Wed | | | 72 | 72 | 72 | 72 | 144 | 144 | 721 |
| 30 | 5/31/2012 | Thu | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 31 | 6/1/2012 | Fri | | | 0 | 0 | 0 | 0 | 0 | 0 | 648 |
| 32 | 6/2/2012 | Sat | | | 72 | 0 | 72 | 0 | 144 | 0 | 720 |
| 33 | 6/3/2012 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 34 | 6/4/2012 | Mon | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 35 | 6/5/2012 | Tue | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 36 | 6/6/2012 | Wed | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 37 | 6/7/2012 | Thu | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 38 | 6/8/2012 | Fri | | | 72 | 72 | 72 | 72 | 144 | 144 | 864 |
| 39 | 6/9/2012 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 40 | 6/10/2012 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 41 | 6/11/2012 | Mon | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 42 | 6/12/2012 | Tue | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 43 | 6/13/2012 | Wed | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 44 | 6/14/2012 | Thu | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 45 | 6/15/2012 | Fri | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 46 | 6/16/2012 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 47 | 6/17/2012 | Sun | | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 48 | 6/18/2012 | Mon | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 49 | 6/19/2012 | Tue | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 50 | 6/20/2012 | Wed | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 51 | 6/21/2012 | Thu | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 52 | 6/22/2012 | Fri | | | 72 | 72 | 72 | 72 | 144 | 144 | 720 |
| 53 | 6/23/2012 | Sat | | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 54 | 6/24/2012 | Sun | 60Day | | 0 | 0 | 0 | 0 | 0 | 0 | 720 |
| 55 | 6/25/2012 | Mon | 60Day | | 72 | 72 | 74 | 72 | 146 | 144 | 722 |
| 56 | 6/26/2012 | Tue | 60Day | | 72 | 72 | 63 | 72 | 145 | 144 | 723 |

Several months later, in a report from an audit on October 3, 2012, Polaris again observed that, at Brandon Woods of New Bedford, "[a] pattern was discovered for some patients by PT and OT using the same duration for multiple treatments.  A number of patients had a significant number of treatments at exactly 57 or 72 minutes in duration."  A copy of this audit report is attached as Exhibit 68.  The auditor further observed that Brandon Woods of New Bedford appeared to be recording consistent minutes in an effort to report the bare minimum number of minutes required

to allow the SNF to achieve a given RUG level:  "Eight of 13 MDSs achieved the RUG within

10 minutes of the total needed."  *Id.*  Data reflecting the claims for the aforementioned patient is

included in Exhibit 5.

85.     In 2013, RehabCare received two Polaris Group audit reports citing improper use

of consistent or rounded minutes at Blaire House of Milford.  In a report dated April 24, 2013,

Polaris noted that, according to one patient file it had reviewed, the patient supposedly received

19 separate treatments that were recorded in durations of exactly 66 minutes.  *See* Exhibit 69.

Later, in November of that same year, Polaris Group told RehabCare that an audit of a new

sample of patient files showed that each file reviewed showed some pattern of rounding.  *See*

Exhibit 70.

86.     RehabCare persistently failed accurately to report the number of minutes of

billable therapy its therapists had performed, thereby creating false records that SNFs relied upon

to submit claims to Medicare.

<u>Billing Evaluation Time As Treatment Time</u>

87.     In order to circumvent the prohibition on reporting time spent on initial

evaluations as therapy time, RehabCare often directed its therapists to report only a fixed amount

of time – *e.g.*, 15 or 30 minutes – as the time spent on an initial evaluation, and then to report,

falsely, that any additional time spent on an initial evaluation was supposedly time spent

providing therapy.

88.     RehabCare provided its therapists with extensive instructions on how to conduct

and document initial evaluations.  Attached as Exhibit 51 are the instructions RehabCare

provided for conducting physical therapy evaluations.  Appended to the instructions is a sample

of an evaluation report.  *See id.* at KHC_RHB-0015505-07.  For many therapists, the average

time spent on an initial evaluation, including preparing the evaluation report, is 45 minutes or longer.

89.     RehabCare personnel have recognized the length of time that it often takes to perform initial evaluations.  For example, in an August 2012 e-mail, a RehabCare Program Director advised RehabCare Regional Vice President Rona Wiedmayer that "an SLP [speech language pathology] eval take up to 90 min."  A copy of the e-mail chain containing this statement is attached as Exhibit 52.  Similarly, in an October 2012 email exchange, a RehabCare Program Director asked her Area Director, Lynette Kibler:  "What is the golden rule for eval time?  Ive always been told 30 min is ideal.  My staff likes to do 45-60 min evals, stating they can't do it in 30."  Ms. Kibler responded:  "Every other therapist in the world is doing this in 40. *I have some doing it in 15, which I think is way too short personally*."  A copy of this email exchange is attached as Exhibit 53 (emphasis added).  In in a May 2012 e-mail, a RehabCare compliance director observed that a pattern of 15 minute evaluations is "a potential problem warranting further review."  A copy of this e-mail is attached as Exhibit 54.  Similarly, in a February 2013 e-mail, a RehabCare claims denial officer recognized that Medicare Administrative Contractors (which process Medicare claims from SNFs) "have complained in the past that a 15 minute eval is insufficient time to perform all the necessary assessments for a thorough evaluation and plan of treatment."  A copy of this e-mail is attached as Exhibit 55.

90.     Notwithstanding the RehabCare instructions to conduct thorough initial evaluations and reports, and its awareness that a pattern of 15 minute evaluations would be problematic, RehabCare directed the therapists at the Ferncliff SNF in Rhinebeck, New York, to report all initial evaluations as 15 minutes, regardless of how long the evaluations actually took, and to report the remaining evaluation time as therapy time.  During the period from September

1, 2010, through August 16, 2013, RehabCare reported that 95% of its therapists' 773 initial

evaluations at Ferncliff took exactly 15 minutes.  For example, RehabCare reported that, on

January 19, 2012, it conducted a 15-minute physical therapy initial evaluation of ███████

and provided him with 72 minutes of physical therapy.  A copy of the RehabCare report of these

minutes is attached as Exhibit 56.  In fact, the physical therapy initial evaluation of ███████

took longer than 15 minutes, and RehabCare provided him with less than 72 minutes of physical

therapy on that date.  RehabCare further reported that, as of the 5-day ARD for ███████, it had

provided him with a total of exactly 720 minutes of therapy (the bare minimum to achieve an

Ultra High RUG).  In fact, because RehabCare understated the length of the initial evaluation

and overstated the amount of therapy provided to ███████ on the day of his initial physical

therapy evaluation, RehabCare provided less than 720 minutes of therapy to him as of the 5-day

ARD, and the resulting Ultra High RUG claim for the first 14 days of ███████'s care was false.

Data reflecting that claim is included in Exhibit 5.

91.     At the Terence Cardinal Cooke SNF in New York, New York, physical therapy

initial evaluations regularly took 45 minutes or longer, but the RehabCare physical therapy

supervisor instructed the physical therapists to report that each initial evaluation took 30 minutes

and to report any remaining evaluation time as treatment time.  As a result of this instruction,

RehabCare reported that, during the period from September 4, 2010, to July 26, 2013, 65 percent

of the 860 physical therapy initial evaluations took exactly 30 minutes.  For example, RehabCare

reported that, on January 14, 2012, it conducted a 30-minute physical therapy initial evaluation

of ███████ and provided her with 45 minutes of physical therapy.  A copy of the

RehabCare report of these minutes is attached as Exhibit 57.  In fact, the physical therapy initial

evaluation of ███████ took longer than 30 minutes, and RehabCare provided her with less

than 45 minutes of physical therapy on that date.  RehabCare further reported that, as of the 5-day ARD for ████████ it had provided her with a total of exactly 720 minutes of therapy (the bare minimum to achieve an Ultra High RUG).  In fact, because RehabCare understated the length of the initial evaluation and overstated the amount of therapy provided to ████████ on the day of her initial physical therapy evaluation, RehabCare provided less than 720 minutes of therapy to ████████ as of the 5-day ARD, and the resulting Ultra High RUG claim for the first 14 days of ████████'s care was false.  Data reflecting that claim is included in Exhibit 5.

92.     During the period from September 2, 2010, through August 8, 2013, RehabCare reported that 89% of its therapists' 1,365 initial evaluations at the Wingate at Beacon SNF took exactly 15 minutes.  For example, RehabCare reported that, on October 14, 2011, it conducted a 15-minute physical therapy initial evaluation of ████████ and provided her with 60 minutes of physical therapy.  A copy of the RehabCare report of these minutes is attached as Exhibit 58.  In fact, the physical therapy initial evaluation of ████████ took longer than 15 minutes, and RehabCare provided her with less than 60 minutes of physical therapy on that date.  RehabCare further reported that, as of the 5-day ARD for ████████ it had provided her with a total of exactly 720 minutes of therapy (the bare minimum to achieve an Ultra High RUG).  In fact, because RehabCare understated the length of the initial evaluation and overstated the amount of therapy provided to ████████ on the day of her initial physical therapy evaluation, RehabCare provided less than 720 minutes of therapy to her as of the 5-day ARD, and the resulting Ultra High RUG claim for the first 14 days of ████████'s care was false.  Data reflecting that claim is included in Exhibit 5.

93.     Similarly, RehabCare management at the Citizens Care SNF often directed therapists there to report that initial therapy evaluations took only 15 minutes, and then to report,

falsely, that any additional time spent on an initial evaluation was supposedly time spent providing therapy.  During the period from October 4, 2010, through September 25, 2013, RehabCare reported that 73% of its therapists' 1,456 initial evaluations at the Citizens Care SNF took exactly 15 minutes.

### RehabCare's Kickback To Life Care Services

94.     Consistent with the HHS-OIG guidance warning about the anti-kickback statute implications of a vendor supplying a customer with the free services of an employee, Kindred's Code of Conduct specifies that "Some examples of kickbacks, referrals and bribes may include . . . providing or accepting free . . . services among referral sources."  A copy of Kindred's Code of Conduct is attached as Exhibit 75.

95.     LCS, together with its affiliated entities, owned and/or operated approximately 126 Continuing Care Retirement Communities, many of which were SNFs providing rehabilitation therapy to residents under Medicare Part A.  LCS was one of RehabCare's largest customers.  Until approximately 2013, LCS operated Edgewood, a retirement community in North Andover, Massachusetts, that includes a SNF.

96.     In 1999, LCS formed Care Purchasing Services, LLC ("CPS"), a purported group purchasing organization (*see* 42 C.F.R. 1001.952(j)) that coordinates purchases of goods and services by its members, which include LCS-operated facilities.  Among other things, CPS identifies potential therapy providers and recommends particular therapy providers to its members.  RehabCare is a CPS "preferred rehabilitation partner," and CPS members use RehabCare more often than any other contract therapy provider.  (As of 2012, the LCS-operated SNFs served by RehabCare also reported, on average, higher percentages of patients in the Ultra High RUG category than did LCS-operated SNFs that used other therapy providers.)  Between

2012 and mid-2014, approximately six LCS-operated SNFs contracted with RehabCare to provide therapy services.

97.     On January 17, 2011, Colleen Jones, RehabCare's Vice President of Operations, met with CPS's senior executive, Kevin Meyer, at CPS's office in Delray Beach, Florida.  Three days later, Mr. Meyer sent Ms. Jones an e-mail stating, in part:  "I wanted to drop you a note to confirm that if you decide to bring on a dedicated rep for LCS / Care Purchasing and want to place them in the Delray office I think it would be great for you[r] business. . . .  They would become part of LCS / CPS."  A copy of this e-mail is attached as Exhibit 76.  Even though the proposed "rep" ostensibly would be an employee of RehabCare, not of LCS or CPS, Ms. Jones responded by asking Mr. Meyer to send "a list of duties that I can use to write a job description." *See id.*  Mr. Meyer then proposed that the new employee's duties include various tasks that would serve CPS, rather than RehabCare, including:  "Track our GPO fees," "Track utilization," "Track and update our sales pipeline tracking spreadsheet."  *See id.*  Shortly after this e-mail exchange, RehabCare hired Jerry Novickas to work in CPS's Delray Beach office.

98.     Mr. Novickas was skilled with Microsoft Office computer applications.  Once he was installed at CPS, Mr. Novickas performed many computer-related tasks that CPS employees otherwise would have had to perform.  RehabCare was well aware that Mr. Novickas was performing these tasks for CPS, as evidenced by the following:

- In his self-evaluation for 2011, Mr. Novickas reported to his nominal RehabCare boss, Jeffrey Pickering, that "I offered my desktop application expertise and training skills with all of the CPS and LCS staff in the building.  I worked closely with Kevin [Meyer]'s Administrative Assistant, remote [business directors] and those with offices in Delray, and as needed helped many of the CPS-LCS staffers with Excel spreadsheets, PowerPoint and Word projects and answered their questions."  He elaborated that these efforts "built a high level of trust that has opened many doors to information and expect will engage even more in the future."  A copy of this self-evaluation, including the cover e-mail, is attached as Exhibit 77.

- In an e-mail dated February 1, 2013, Mr. Novickas told his nominal boss, Jeffrey Pickering, that "I have been helping Kevin [Meyer of CPS] put his presentation together for their corporate LCS meeting next week." A copy of this e-mail is attached as Exhibit 19.

- In an e-mail dated February 5, 2013, Mr. Novickas told Ms. Jones that "Meredith [Mull of CPS] asked me to create a tracking report (attached) for all the LCS locations for RUGS and patient count by [CPS District Operations Manager]." A copy of this e-mail is attached as Exhibit 20.

- In an e-mail dated March 27, 2013, Mr. Novickas told Ms. Jones and Mr. Pickering that he "[w]as in a meeting yesterday on a new CPS clinical brochure LCS-CPS is prepping for future trade shows." A copy of this e-mail is attached as Exhibit 46.

- In an e-mail dated May 13, 2013, Mr. Novickas told Ms. Jones that "Meredith [Mull of CPS] asked me to gather and compile some performance data for ALL the LCS . . . sites [w]here CPS has a therapy vendor," and he attached a copy of the report he compiled from this data. A copy of this e-mail is attached as Exhibit 73.

- In an e-mail dated August 27, 2013, Mr. Novickas told Ms. Jones that "I was training Meredith [Mull of CPS] on Excel this morning." A copy of this e-mail is attached as Exhibit 72.

- In an e-mail dated November 1, 2013, Ms. Jones reported to one of her RehabCare colleagues that "Jerry [Novickas] does a lot of things for Jeff [Pickering] in sales and a lot of things for CPS, actually." A copy of this e-mail is attached as Exhibit 62.

99.     Mr. Novickas provided sworn testimony explaining that he and RehabCare had hoped that, by helping CPS with non-RehabCare tasks, CPS would help RehabCare secure additional business with CPS members:

Q.      In other words, you hoped that these tasks you were doing at CPS would lead to CPS recommending or putting in a good word for RehabCare to its members?

A.      Yes.

Q.      With regard to these sorts of tasks, were you in touch with your RehabCare contacts about doing these things?

A.      Yes.  I would, on phone calls with Colleen [Jones] or Jeff [Pickering] I
        would mention I've been asked to do this and asked to do that.

Q.      How did they respond?

A.      Sounds good.

Q.      Did they agree with you that these sorts of tasks could help RehabCare
        with CPS's members?

A.      Yes.

\* \* \*

Q.      Do you recall ever discussing with one of your contacts at RehabCare that
        you were helping [CPS] employees with computer programs?

A.      Yes.

Q.      Do you remember their response?

A.      If it's going to help us get more opportunities to bid, yes.  I mean, okay.

Copies of the transcript pages from which these excerpts are taken are included in Exhibit 31 at

pages 41-42 and 70.

100.    Mr. Novickas testified that CPS employees were receptive to such overtures:

Q.      Can you explain to me in practice how your helping a CPS employee with a
        computer program could help RehabCare get opportunities to bid?

A.      Well, they would see us as partner rather than just a vendor, and I would often say
        as part of one of these training sessions, you know, who are you going, what
        communities are you going to be visiting soon?  You know, can you mention
        RehabCare and try and get our foot in the door?

Q.      How would the[ CPS employees] respond to that?

\* \* \*

A:      They would be open to that.

*Id.* at 70-71.

101.    On September 18, 2012, Ms. Mull of CPS asked Ms. Jones if RehabCare was

"concerned about Jerry [Novickas] and the[] fact he is paid for by [RehabCare]."  Ms. Jones

responded:  "Oh no.  Not at all.  Jerry is very helpful.  We just want 'credit' in the RFI process

because of the investment.  He does a # of things for CPS."  A copy of this e-mail exchange is

attached as Exhibit 22.  The "RFI process" referenced by Ms. Jones stemmed from a 2012

request by CPS to therapy providers for information concerning their capabilities of serving CPS

members.  CPS used this information in formulating recommendations on therapy providers to

its members.

102.    As CPS conducted its RFI process with RehabCare and other therapy vendors,

dozens of CPS member facilities, including a number of LCS-operated SNFs, evaluated therapy

vendors and executed new therapy contracts with RehabCare.  Examples of claims that these

LCS-operated and RehabCare-served SNFs submitted to Medicare are attached in Exhibit 5.

### Count I:  False or Fraudulent Claims
(31 U.S.C. § 3729(a)(1)(A); previously 31 U.S.C. 3729(a)(1))

103.    Plaintiff United States repeats and realleges each allegation in each of the

preceding paragraphs as if fully set forth herein.

104.    During the period from January 1, 2009, through September 30, 2013, the

defendants knowingly caused the presentation of false or fraudulent claims for payment or

approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims

for payment to Medicare Part A for unreasonable, unnecessary, or unskilled therapy, or for

therapy that was not provided.

105.    By virtue of the false or fraudulent claims defendants knowingly caused to be

presented, the United States has suffered actual damages and is entitled to recover treble

damages plus a civil monetary penalty for each false claim.

## Count II:  False Statements
### (31 U.S.C. § 3729(a)(1)(B); previously 31 U.S.C. 3729(a)(2))

106.    Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

107.    During the period from January 1, 2009, through September 30, 2013, the defendants knowingly made, used, or caused to be made or used false records or statements, including false MDS forms, material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

108.    By virtue of the false records or statements defendants made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count III:  False Claims Resulting From Kickbacks
### (31 U.S.C. § 3729(a)(1)(A); previously 31 U.S.C. 3729(a)(1))

109.    Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

110.    As a result of RehabCare's kickbacks to induce LCS and CPS to purchase, order, or recommend or arrange for the purchasing or ordering of RehabCare's services, in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), all of the claims RehabCare presented or caused to be presented to Medicare by LCS-operated SNFs that contracted with RehabCare between 2012 and mid-2014 are false or fraudulent.  Accordingly, RehabCare knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

111.    By virtue of the false or fraudulent claims RehabCare knowingly caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### Count IV:  Unjust Enrichment

112.    Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

113.    During the period from January 1, 2009, through September 30, 2013, by virtue of causing claims to be submitted to Medicare for unreasonable, unnecessary, or unskilled services, or for therapy that was not provided, the defendants obtained portions of inflated payments from the United States to which they were not entitled.  Thus, the defendants were unjustly enriched at the expense of the United States in such amounts to be determined at trial.

### Count V:  Conversion

114.    Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

115.    During the period from January 1, 2009, through September 30, 2013, by virtue of the acts described, and specifically by causing the submission of claims and obtaining payment, directly or indirectly, for rehabilitation therapy services that were unnecessary, unreasonable, or unskilled, that was not provided, or that otherwise failed to meet Medicare criteria for coverage and payment, defendants have appropriated the United States' property for their own use and benefit, and have exercised dominion of such property in defiance of the United States' rights.

116.    Defendants are, therefore, liable to the United States for actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of

the United States as follows:

1.      On the First, Second, and Third Counts under the False Claims Act, for the

amount of the United States' damages, trebled as required by law, and such civil penalties as are

required by law, together with all such further relief as may be just and proper.

2.      On the Fourth Count for unjust enrichment, for the damages sustained and/or

amounts by which defendants were unjustly enriched or amounts which defendants retained from

reimbursements paid by the United States to which they were not entitled, plus interest, costs,

and expenses.

3.      On the Fifth Count for conversion, for the damages sustained by the United States

in an amount to be determined at trial, plus interest, costs, and expenses.

4.      All other relief as may be required or authorized by law and in the interests of

justice.

Dated:  January 11, 2016

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

MICHAEL D. GRANSTON
ANDY J. MAO
CHRISTELLE KLOVERS
ROHITH V. SRINIVAS
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 305-3656
christelle.klovers@usdoj.gov

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

GREGG SHAPIRO (BBO No. 642069)
PATRICK M. CALLAHAN (BBO No. 648173)
Assistant United States Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel:  (617) 748-3366
gregg.shapiro@usdoj.gov